IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

-------------------------------------

No. 25-30263

-------------------------------------

Luke G. Sahs,
Plaintiff - Appellee

v.

Loyola University New Orleans,
Defendant - Appellant

-----------------------------------------------------

On Appeal from the United States District Court
for the Eastern District of Louisiana,
Civil Action No. 2:24-cv-01379,
Hon. Susie Morgan, Judge Presiding

--------------------------------------------------

## BRIEF OF DEFENDANT-APPELLANT, LOYOLA UNIVERSITY NEW ORLEANS

Julie D. Livaudais (La. Bar No. 01183)
Charles D. Marshall, III (La. Bar No. 27564),
*Appeal Counsel*
Douglas L. Grundmeyer (La. Bar No. 06362)
CHAFFE McCALL, L.L.P.
1100 Poydras Street
2300 Energy Centre
New Orleans, LA 70163-2300
Telephone: (504) 585-7000
Facsimile: (504) 585-7075
Email: livaudais@chaffe.com
     marshall@chaffe.com
     grundmeyer@chaffe.com

***Attorneys for Defendant-Appellant, Loyola University New Orleans***

No. 25-30263

Luke G. Sahs, Plaintiff-Appellee

v.

Loyola University New Orleans, Defendant-Appellant

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1.  **Luke G. Sahs**, *plaintiff-appellee;*

2.  **Andrew C. Stebbins, Christina N. Williams, and the law firm of Buckingham Doolittle & Burroughs LLC,** *attorneys for plaintiff-appellee;*

3.  **John W. Carpenter and the Law Offices of John W. Carpenter, LLC,** *attorneys for plaintiff-appellee;*

4.  **Elizabeth Bagert Carpenter and the Law Office of Elizabeth Bagert Carpenter,** *attorneys for plaintiff-appellee;*

5.  **Victoria E. Brieant,** *attorney for plaintiff-appellee;*

6.  **Loyola University New Orleans,** *defendant-appellant; and*

7.     **Julie D. Livaudais, Charles D. Marshall, III, Douglas L. Grundmeyer, Rosalie M. Haug, and the law firm of Chaffe McCall, L.L.P.**, *attorneys for defendant-appellant*.

*/s/ Charles D. Marshall, III*
Julie D. Livaudais (La. Bar No. 01183)
Charles D. Marshall, III (La. Bar No. 27564)
*Appeal Counsel*
Douglas L. Grundmeyer (La. Bar No. 06362)
CHAFFE McCALL, L.L.P.
1100 Poydras Street
2300 Energy Centre
New Orleans, LA  70163-2300
Telephone:  (504) 585-7000
Facsimile: (504) 585-7075
Email:   livaudais@chaffe.com
            marshall@chaffe.com
            grundmeyer@chaffe.com

***Attorneys for Defendant-Appellant,***
***Loyola University New Orleans***

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF CONTENTS ................................................................................... iii

TABLE OF AUTHORITIES ................................................................................ v

STATEMENT REGARDING ORAL ARGUMENT .............................................. x

JURISDICTIONAL STATEMENT ...................................................................... 1

STATEMENT OF THE ISSUES .......................................................................... 1

STATEMENT OF THE CASE .............................................................................. 1

   **I.  Statement of Facts** ........................................................................ 3

   **II.  Procedural History** ....................................................................... 8

      **A.  Sahs files suit** ......................................................................... 8

      **B.  Loyola files a special motion to strike under La. C.C.P. art. 971.** .......... 8

      **C.  The District Court denies Loyola's Article 971 motion.** ........................ 10

SUMMARY OF ARGUMENT ............................................................................ 12

ARGUMENT .................................................................................................... 13

   **I.  A *de novo* standard of review applies.** ...................................... 13

   **II.  The District Court erred in refusing to apply La. C.C.P. art. 971 in this diversity action.** ...................................................... 13

      **A.  Under binding Fifth Circuit precedents in *Henry* and its progeny, Article 971 applies in this case and does not conflict with the Federal Rules.** ...................................................... 13

      **B.  The Supreme Court's decision in *Shady Grove* does not prevent Article 971 from applying in this case** ...................... 18

iii

**C. The Fifth Circuit's decision in *Klocke* and Judge Graves's dissent in *Cuba* do not prevent Article 971 from applying in this case.** ................................................................25

**III. This Court should reverse the District Court's order and render judgment on the appellate record granting Loyola's Article 971 motion.** ..............................................27

**A. Loyola has Constitutional rights to freedom of speech.** .......................29

**B. Loyola's speech about Sahs's arrest concerned a matter of public interest.** ...............................................................30

**C. Sahs cannot establish a probability of success on any of his claims** ........32

   **1. Sahs has no viable claim in defamation.** ................................................32

     **a.   Sahs must prove falsity and malice.** ....................................................33

     **b.   Sahs cannot prove falsity and malice in Sgt. Bell's privileged statements to a reporter about Sahs's arrest.** ............................................34

     **c. Sahs cannot prove falsity and malice in student reporter Kloe Witt's privileged article in *The Maroon*.** .....................................37

     **d. Sahs cannot prove falsity and malice in faculty advisor Michael Giusti's privileged amended article in *The Maroon*.** .............41

   **2. Sahs has no viable claims in negligence, negligent infliction of emotional distress, or vicarious liability.** ..........................44

   **3. Sahs has no viable claims for breach of contract or the covenant of good faith and fair dealing.** ................................................48

CONCLUSION ................................................................54

CERTIFICATE OF SERVICE ................................................................55

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ..........56

ADDENDUM OF LA. C.C.P. ART. 971 ………………………………………… A-1

# <u>TABLE OF AUTHORITIES</u>

*Cases*

*Armington v. Fink*, 2010 WL 743524 (E.D. La. Feb. 24, 2010)....................... 15, 24

*Bates v. Times-Picayune Publishing Corp.*, 527 So.2d 407 (La. App. 4 Cir. 1988), *writ denied*, 532 So. 2d 136 (La. 1988)..............................................................38

*Bill Partin Jewelry, Inc. v. Smith*, 467 So.2d 188  (La. App. 3 Cir. 1985)..............42

*Block v. Tanenhaus*, 815 F.3d 218 (5th Cir. 2016)............. 10, 12, 13, 16, 17, 18, 26

*Blouin v. Loyola University*, 506 F.2d 20 (5th Cir. 1975) .......................................51

*Brown v. Wimberly*, 2011 WL 5438994 (E.D. La. Nov. 9, 2011), *aff'd*, 477 Fed. Appx. 214 (5th Cir. 2012) ................................................................................ 15, 24

*Burlington Northern R. Co. v. Woods*, 480 U.S. 1 1987) ........................................19

*Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115 (5th Cir. 1992).............17

*Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010) ..........................29

*Clark v. America's Favorite Chicken Co.,* 110 F.3d 295 (5th Cir. 1997) ...............50
\
*Collins v. WAFB, LLC*, 2017 WL 1383948 (E.D. La. Apr. 18, 2017) . 15, 31, 34, 38

*Columbia Union College v. Clarke*, 159 F. 3d 151 (4th Cir. 1998) ........................30

*Connick v. Myers*, 461 U.S. 138 (1983)...................................................................31

*CoreCivic, Inc. v. Candide Group, LLC*, 46 F.4th 1136 (9th Cir. 2022) ......... 22, 27

*Cuba v. Pylant*, 814 F.3d 701 (5th Cir. 2016) ...................................... 10, 11, 12, 25
*Cyprien v. Board of Supervisors for the University of Louisiana System*, 08-1067 (La. 1/21/09), 5 So.3d 862, 867...........................................................................39

*Darden v. Smith*, 03-1144 (La. App. 3 Cir. 6/30/04), 879 So.2d 390, *writ denied*, 04-1955 (La. 11/15/04), 887 So.2d 480 ................................................................47

*Dobson v. La. Power & Light Co.*, 567 So.2d 569 (La. 1990) ................................45

*Doe v. Loyola University*, 2020 WL 1030844 (E.D. La. Mar. 3, 2020).................51

*Doe v. Trustees of Boston College*, 942 F.3d 527 (1st Cir. 2019)..........................51

*Dyas v. Shreveport Police Dept.*, 48,804 (La. App. 2 Cir. 2/26/14), 136 So.3d 897, *writ denied*, 14-0909 (La. 1/23/15), 159 So.3d 1055 ...........................................36

*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)................................................. *passim*

*Evans v. Interim LSU Public Hospital*, 13-1085 (La. App. 1 Cir. 4/28/14), 2014 WL 1691343, *writ denied*, 14-1278 (La. 9/26/14), 149 So.3d 266......................37

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978).............................29

*Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010) ........................................ 22, 23, 24

*Hakim v. O'Donnell*, 49,139, 49,140 (La. App. 2 Cir. 6/25/14), 144 So.3d 1179, *writ denied*, 14-1501 (La. 11/7/14), 152 So.3d 175, *cert. denied*, 575 U.S. 936 (2015)...................................................................................................................41

*Hanna v. Plumer*, 380 U.S. 460 (1965) ......................................................... 19, 20

*Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164 (5th Cir. 2009) ............................................................................................................... *passim*

*Hopkins v. Keith*, 348 So.2d 999 (La. App. 2 Cir. 1977), *writ not considered*, 350 So.2d 893 (La. 1977) .............................................................................................42

*I.I. Rosen v. Capital City Press*, 314 So.2d 511 (La. App. 1 Cir. 1975) ................42

*Jambon v. Queen Bess Bay Owners Association, Inc.*, 21-626 (La. App. 5 Cir. 12/33/21), 2021 WL 5830057 ...............................................................................47

*Johnson v. Purpera*, 20-1175 (La. 5/13/21), 320 So.3d 374 ............................ 32, 34

*Johnston v. NOE Corp. L.L.C.*, 46,647 (La. App. 2 Cir. 11/23/11), 81 So.3d 735, *writ denied*, 11-2838 (La. 3/2/12), 84 So.3d 532 .................................................32

*Kelly v. West Cash & Carry Bldg. Materials Store*, 99-0102 (La. App. 4 Cir. 10/20/99), 745 So.2d 743 ...................................................................................46

*Kennedy v. Sheriff of East Baton Rouge*, 05-1418 (La. 7/10/06), 935 So.2d 669 ................................................................................................ 31, 33

*Kidder v. Anderson*, 354 So.2d 1306 (La. 1978), *cert. denied,* 439 U.S. 829 (1978) ....................................................................................................................... 33, 34

*Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019) ............................ 10, 11, 12, 25, 26

*La. Crisis Assistance Center v. Marzano-Lesnevich*, 878 F.Supp.2d 662 (E.D. La. 2012) ..............................................................................................................48

*Lozovyy v. Kurtz*, 813 F.3d 576 (5th Cir. 2015)................................................ *passim*

*Martin v. State, Dept. of Public Safety and Corrections, Office of State Police*, 47,647 (La. App. 2 Cir. 1/16/13), 109 So.3d 442...................................................37

*Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94), 646 So.2d 318 ...............45

*McGarry v. University of San Diego*, 64 Cal. Rptr. 3d 467 (Cal App. 4 Dist. 2007) ...................................................................................................................29

*McIntyre v. Gilmore*, 2015 WL 2250210 (E.D. La. May 13, 2015)................. 32, 48

*Milliner v. Turner,* 436 So.2d 1300 (La. App. 4 Cir. 1983), *writ denied*, 442 So.2d 453 (La. 1983) ........................................................................................47

*Morgavi v. Mumme,* 270 So.2d 540 (La. 1972).......................................................50

*Painter v. State Through Office of Governor*, 18-1289 (La. App. 1 Cir. 12/26/18), 2018 WL 6807124, *writ denied*, 19-0283 (La. 4/8/19), 267 So.3d 610, *cert. denied*, 140 S.Ct. 224 (2019).................................................................................48

*Perniciaro v. McInnis*, 19-0671 (La. App. 4 Cir. 4/1/20), 293 So.3d 1144, *writ denied*, 20-00492 (La. 7/2/20), 297 So.3d 767....................................................41

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) .............................33

*Phillips v. L. Brands Service Company, L.L.C.*, 82 F.4th 291  (5th Cir. 2023).......46

*Plummer v. Univ. of Houston*, 860 F.3d 767 (5th Cir. 2017) .................................52

*Sam's Style Shop v. Cosmos Broadcasting Corp.,* 694 F.2d 998 (5th Cir. 1983)....50

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) ................................................................................................................... *passim*

*Shafiq v. Ochsner Health Sys.*, 2019 WL 1199755 (E.D. La. Mar. 13, 2019) ........50

*Shelton v. Pavon*, 17-0482 (La. 10/18/17), 236 So.3d 1233...................................31

*Sher v. Lafayette Ins. Co.*, 07-2441, 07-2443 (La. 7/7/08), 988 So.2d 186.............17

*Snyder v. Phelps*, 562 U.S. 443 (2011) ..................................................................31

*Spears v. McCormick & Co., Inc.*, 520 So.2d 805 (La. App 3 Cir. 1987), *writ denied*, 522 So.2d 563 (La. 1988) ........................................................................33

*St. Amant v. Thompson,* 390 U.S. 727 (1968)..........................................................41

*Tarpley v. Colfax Chronicle*, 94-2919 (La. 2/17/95), 650 So.2d 738.....................33

*Terrebonne Concrete, LLC v. CEC Enterprises, LLC,* 11-0072 (La. App. 1 Cir. 8/17/11), 76 So.3d 502, *writ denied*, 11-2021 (La. 11/18/11), 75 So.3d 464 ......50

*Thomas v. City of Monroe*, 36,526 (La. App. 2 Cir. 12/18/02), 833 So.2d 1282....38

*Thomas v. Fry's Electronics, Inc.*, 400 F.3d 1206 (9th Cir. 2005).........................14

*Trentecosta v. Beck*, 96-2388 (La. 10/21/97), 703 So.2d 552 ................................35

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999........................................................................ 14, 21, 22, 23, 24, 27

*Walker v. Armco Steel Corp.*, 446 U.S. 740 (1980).................................... 19, 20, 21

*Wilson v. Capital City Press*, 315 So.2d 393 (La. App. 3 Cir. 1975), *writ denied*, 320 So.2d 203 (La. 1975) ......................................................................38

*Wyatt v. Elcom of La., Inc.*, 34,786 (La. App. 2 Cir. 6/22/01), 792 So.2d 832 .......39

*Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066 (5th Cir. 1987) ................. 39. 44

*Statutes*

20 U.S.C. §1681 ........................................................................................52

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1332 .........................................................................................1

28 U.S.C. § 2072 .......................................................................................19

La. C.C. art. 1983 .....................................................................................50

La. C.C.P. art. 971 ............................................................................. *passim*

*Rules*

Fed. R. App. P. 4 ........................................................................................1

Fed. R. Civ. 12 ........................................................................................15

Fed. R. Civ. P. 12 ................................................................................. ix, 12

Fed. R. Civ. P. 23 .....................................................................................18

Fed. R. Civ. P. 56

*Constitutional Provisions*

U.S. Const. amend. I ........................................................................ *passim*

## STATEMENT REGARDING ORAL ARGUMENT

This Court should grant oral argument in this case. In the ruling at issue in this collateral-order appeal, the District Court denied defendant-appellant Loyola University New Orleans ("Loyola")'s special motion to strike under La. C.C.P. art. 971, seeking to dismiss plaintiff-appellee Luke G. Sahs's defamation claims and related theories of recovery in this diversity action. ROA.1097-1117. The District Court concluded that Article 971 conflicts with the Fed. R. Civ. P. 12 and 56 and therefore does not apply in federal court. ROA.1106-1117.

The District Court's order contravenes the Fifth Circuit's precedential decision directly on point, *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164, 168-169 (5th Cir. 2009), which unequivocally holds that "Louisiana law, including the nominally-procedural Article 971, governs this diversity case." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Indeed, the District Court acknowledges here that *Henry* applied Article 971 in federal court, that a "circuit split" exists on this issue, and that the Fifth Circuit "has declined to re-examine *Henry* or otherwise reach the issue." ROA.1107-1108.

This appeal now squarely presents these important issues for the Fifth Circuit's definitive ruling. Oral argument will assist this Court on *de novo* review in resolving these questions under *Henry*, its progeny, and the *Erie* doctrine and in ruling on the merits of Loyola's motion under Article 971 on the complete record.

x

## JURISDICTIONAL STATEMENT

Diversity jurisdiction exists under 28 U.S.C. § 1332 in this action between Sahs and Loyola, respectively citizens of Florida and Louisiana. ROA.641-42. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and the collateral-order doctrine. *Henry*, 566 F.3d at 170-181. On April 9, 2025, the District Court entered its Order and Reasons denying Loyola's Article 971 motion. ROA.1097-1117. On April 30, 2025, under Fed. R. App. P. 4(a)(1)(A) and (7)(A) and (B), Loyola timely filed its Notice of Appeal from that ruling. ROA.1118-19. This Court has granted Loyola's motion for a stay pending appeal. Rec. Doc. 40-2.

## STATEMENT OF THE ISSUES

1. **Whether the District Court erred in denying Loyola's special motion to strike, upon concluding that La. C.C.P. art. 971 does not apply in this diversity action in federal court.**

2. **Whether this Court should reverse the District Court's judgment, grant Loyola's Article 971 motion on the appellate record, dismiss Sahs's action, and remand the matter to the District Court for an award of attorney's fees and costs to Loyola.**

## STATEMENT OF THE CASE

Sahs alleges that Loyola defamed him through its police officer's statements and its reporters' articles in Loyola's student newspaper, *The Maroon*, about Sahs's on-campus arrest by the New Orleans Police Department ("NOPD") after his classmate complained that Sahs was stalking her and making threatening statements

1

about his ability to make bombs and mix dangerous chemicals that could harm Loyola students.  ROA.640-749.

Under La. C.C.P. art. 971(A)(1), "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech … in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim." Article 971—Louisiana's "anti-SLAPP" statute (an acronym meaning "Strategic Lawsuit Against Public Participation")— is designed "to be used early in legal proceedings to screen meritless claims pursued to chill one's constitutional rights under the First Amendment of the United States Constitution to freedom of speech and press." *Henry*, 566 F.3d at 169-170 (citations omitted).  It applies in federal diversity actions. *Id*. at 168-169.

Consistent with *Henry*, Loyola filed its Article 971 motion with supporting affidavits, contending that all of Sahs's alleged causes of action arose from Loyola's privileged acts in furtherance of its constitutional rights of free speech on an issue of public interest—reporting on a criminal investigation and arrest—and that Sahs could not demonstrate a probability of success of prevailing on his defamation claims or any other theory of recovery alleged.  ROA.792-930.  The record evidence material to Loyola's motion includes the police reports and an NOPD body-camera video of Sahs's arrest, where he admitted to police his history of bomb making, his

2

scarring and chemical burns from setting off bombs he had made, his statements to his classmates about "chemical weapons" and "bombs," his bragging about his involvement in filming a Florida restaurant bomb explosion, his Internet searches for vendors of dangerous chemicals, his statements about his access to pure zinc and white phosphorous, his realization that his statements were terrifying, and his remorse for making his classmate feel unsafe. ROA.1003, 1023.

Loyola's well-founded Article 971 motion rests upon strong privileges of law-enforcement officers and journalists to report on criminal investigations and arrests. When they are considered with Sahs's videotaped admissions to the NOPD acknowledging his threatening statements that led directly to his arrest, Sahs cannot support his defamation and derivative claims as a matter of law.

## I.    Statement of Facts

On March 2, 2023, in a detailed criminal complaint to police, corroborated by her digital journal of the alleged events, Morgan Matteson, a Loyola student, alleged that Sahs, her classmate, had made threatening statements to her during a school-sponsored study trip in Honduras. ROA.729. As stated in the narrative portion of the NOPD's Incident Report, Matteson asserted that Sahs had admitted to stalking her for months and had said that he could make bombs and mix and release deadly chemicals in a Loyola dormitory to kill its occupants:

ON THURSDAY, THE 2ND DAY OF MARCH 2023, AT APPROXIMATELY 3:30 P.M. … OFFICER COLEMAN WAS INSIDE OF THE 2ND DISTRICT POLICE STATION WHEN THE VICTIM OF A STALKING INCIDENT WALKED IN AND REQUESTED TO SPEAK WITH POLICE. …

OFFICER COLEMAN THEN SPOKE WITH THE VICTIM, MISS MORGAN MATTESON, WHO STATED THE FOLLOWING. DURING THE WEEK OF 02/18/23 TO 02/25/23, MISS MATTESON, A CURRENT LOYOLA UNIVERSITY STUDENT, TRAVELED WITH OTHER LOYOLA STUDENTS AND FACULTY TO THE COUNTRY OF HONDURAS TO PARTICIPATE IN A STUDY ABROAD PROGRAM. DURING THAT WEEK, MISS MATTESON BECAME ACQUAINTED WITH ANOTHER STUDENT THAT WAS ALSO PARTICIPATING IN THE TRIP. THE OTHER STUDENT, MR. LUKE SAHS … AND MISS MATTESON HAD NOT HAD A PREVIOUS KNOWN INTERACTION.

ON 2/22/23 AT APPROXIMATELY 11:30 PM, MISS MATTESON ENTERED THE BATHROOM OF THE ROOM SHE WAS OCCUPYING DURING THE TRIP. THE BATHROOM WAS SHARED BETWEEN TWO DIFFERENT ROOMS. THE OTHER ROOM ATTACHED TO MISS MATTESON BELONGED TO MR. SAHS. MR. SAHS ENTERED THE BATHROOM AND CONFRONTED MISS MATTESON. MR. SAHS INFORMED MISS MATTESON THAT HE HAD BEEN WATCHING HER MOVEMENTS AND FOLLWING HER FOR MONTHS IN NEW ORLEANS. MR. SAHS INFORMED HER THAT HE KNEW HER ROUTE FROM SCHOOL TO HER RESIDENCE, WHERE AND WHAT SHE ATE FOR MEALS, AND WHERE SHE SPENT HER FREE TIME. HE SPECIFCALLY INFORMED HER THAT HE KNEW OF HER WALKS TO AUDUBON PARK ALONE WHERE SHE WOULD SIT ALONE AND READ. MR. SAHS DIRECTLY TOLD MISS MATTESON THAT HE WAS "OBSESSED" AND "CARNALLY ATTRACTED" TO HER.…

**MISS MATTESON THEN SHOWED OFFICER COLEMAN A DETAILED DIGITAL JOURNAL OF THE INCIDENTS WITH**

4

**MR. SAHS DURING THE TRIP SHE HAD KEPT TO KEEP A PERSONAL RECORD.**

DUE TO MISS MATTESON'S STATEMENTS AND RECORDS, OFFICER COLEMAN ISSUED A WARRANT FOR THE ARREST OF MR. SAHS FOR THE CHARGE OF LA RS 14:40.2- STALKING.

**IT SHOULD ALSO BE NOTED THAT DURING THAT SAME WEEK, MISS MATTESON NOTED A LARGE AMOUNT OF CONCERNING INFORMATION ABOUT MR. SAHS.... SAHS ALSO MADE MULTIPLE STATEMENTS THAT HE KNEW HOW TO BUILD BOTH BOMBS AND CHEMICAL WARFARE DEVICES. MR. SAHS WENT INTO DETAIL DESCRIBING HOW HE COULD COMBINE WHITE PHOSPHOROUS AND PURE ZINC TO CREATE A DEADLY CHEMICAL. MR. SAHS MADE COMMMENTS THAT HE COULD USE A CHEMICAL AGENT IN HIS ON CAMPUS DORMITORY VENTS TO KILL EVEYONE IN THE BUILDING. MR. SAHS SHOWED MULTIPLE STUDENTS PICTURES OF A BOMB THAT WAS SAID TO HAVE BEEN USED IN FLORIDA IN A FAST FOOD RESTAURANT. MISS MATTESON OBSERVED MULTIPLE HEALED INJURIES ON MR. SAHS THAT HE HAD CLAIMED WERE CHEMICAL BURNS....**

ROA.729. (Emphasis added).

Based on Matteson's statements and notes, the NOPD obtained a warrant to arrest Sahs for stalking. ROA.730-32. The NOPD briefed Sergeant Damon Bell of the Loyola University Police Department ("LUPD") about Matteson's complaint, including her assertions that Sahs had made threatening statements that he could mix dangerous chemicals that could harm people on Loyola's campus. ROA.903-904. (Affidavit of Damon Bell, ¶¶ 1-3, 8-9). Working with Sgt. Bell, several NOPD officers arrested Sahs on campus. ROA.904. (Bell Affidavit, ¶ 10).

5

Kloe Witt, the Breaking News Editor of Loyola's student newspaper, *The Maroon*, then spoke with Sgt. Bell about Sahs's investigation and arrest. ROA.909-910. (Affidavit of Kloe Witt, ¶¶ 4-7). Witt recorded their conversation to accurately report information learned from him. ROA.910, 912. (Witt Affidavit, ¶¶ 8-9 and Exhibit 2-A thereto). Sgt. Bell's statements to Witt included the following:

> Let me give you a little bit of background. There was the separation order um for the stalking, uh for this guy [Sahs], but in addition to that, he started to go on social media and talk about things like where his parents are from, his nationality . . . he has chemical material in possession that he can mix, that he can kill people with and different things like that, so I think he's gonna be brought up on some terroristic uh threats also.

ROA.905. (Bell Affidavit, ¶ 13); ROA.1014. (Transcription). Based on his "nearly 20 years" in campus law enforcement, the "numerous NOPD police officers" making the arrest, and his NOPD briefing, Sgt. Bell believed in good faith that "the seriousness of the allegations against Mr. Sahs related to his threats about the ability to mix chemicals to harm others on campus and was the reason for the level of participation from the NOPD" and that additional charges would be forthcoming based on briefing information, "including that Sahs was alleged to have made threats that he had chemical materials in his possession that he could mix to cause harm to other people." ROA.905, 908. (Bell Affidavit, ¶¶ 11 and 18 and Exhibit A thereto).

On the evening of March 2, 2023, Witt wrote an on-line article in *The Maroon*, "Loyola student arrested in dining hall," about Sahs's investigation and arrest:

> According to LUPD, a student filed a report accusing Sahs of stalking. Loyola police said Sahs was in possession of chemical materials that can be used to kill people. LUPD said they believe he will be brought up on terroristic threat charges as well.

ROA.910-911, 913. (Witt Affidavit, ¶¶ 10-13 and Exhibit 2B thereto).

The Orleans Parish Magistrate Court charged Sahs with stalking, set his bond, and issued orders "to remain in effect until the disposition of this case," requiring him to "stay away" and "keep off the Loyola University campus as well." ROA.734. (Docket Master); ROA.919. (Affidavit of Dallas Flint, ¶ 9). Loyola suspended Sahs pending his criminal charge. ROA.739-740; ROA.918. (Flint Affidavit, ¶ 5). After bail release, Sahs returned to Florida and withdrew from Loyola before his suspension hearing was scheduled. ROA.920. (Flint Affidavit, ¶ 15).

On March 10, 2023, Loyola removed Witt's article from *The Maroon*'s website at Sahs's attorney's request. ROA.915. (Affidavit of Michael Giusti, ¶ 7). On March 16, 2023, with Loyola's permission, Professor Michael Giusti, *The Maroon*'s faculty advisor, reposted an amended article—rephrasing its language, noting Sahs's release on bail, and removing references to Sgt. Bell's statements about social-media posts and possible future charges related to terrorism. ROA.745; ROA.914-915 (Giusti Affidavit, ¶¶ 3-4, 9-10). The amended article included the following statements concerning Sahs's arrest:

7

> According to an Orleans Parish Sheriff's Office arrest affidavit, a student filed a report accusing Sahs of stalking. The affidavit claimed Sahs was in possession of chemical materials that can be used to kill people.

ROA.745. In that last sentence, Giusti mistakenly referred to NOPD's arrest affidavit, instead of its Incident Report. ROA.915-916. (Giusti Affidavit, ¶¶ 11-13).

## II.     Procedural History

### A.     Sahs files suit.

Sahs filed this diversity action in the Southern District of Florida, which court transferred the case to the Eastern District of Louisiana upon finding no basis for personal jurisdiction over Loyola in Florida. ROA.327-332. In his First Amended Complaint, Sahs alleged defamation from Sgt. Bell's oral statements to Witt and the two news articles in *The Maroon*. ROA.673-691. Sahs also pleaded claims in negligence, negligent infliction of emotional distress, and vicarious liability. ROA.691-696. And he alleged breach of Loyola's Code of Student Conduct and covenants of good faith and fair dealing in suspending him. ROA.697-701.

### B. Loyola files a special motion to strike under La. C.C.P. art. 971.

Loyola filed its Answer and Affirmative Defenses and its Article 971 motion. ROA.754-787, 862-930. Loyola contended that Sahs's alleged claims arose out of Loyola's exercise of its Constitutional rights of free speech on an issue of public interest and concern, Sahs's criminal investigation and arrest. ROA.877-880. Loyola further asserted that Sahs had no probability of success on any of his claims

as a matter of law because the allegedly defamatory statements were subject to qualified privileges held by law-enforcement officers and journalists. ROA.880-899. Loyola attached supporting affidavits of Sgt. Bell, Kloe Witt, Michael Giusti, and Dallas Flint (Loyola's Director of Student Conduct). ROA.903-930.

Sahs filed an opposition and counter declarations, including the NOPD video of his arrest and statements to the police. ROA.945-1023. In that video, which corroborated Morgan Matteson's allegations, Sahs admitted (1) his history of bomb-making (*See* NOPD Video at 30:58-31:24 and 32:20-32:29); (2) that he "scarred [his] back" and had "chemical burns" from setting off bombs he had made (*Id.* at 30:59–31:25 and 33:08–33:14); (3) his statements about "chemical weapons" and "bombs" to other students on his school-sponsored trip (*Id.* at 12:50-13:50); (4) his boasts of personally filming a bomb explosion in a Florida restaurant and showing students a video of it (*Id.* at 15:00-15:22 and 31:26-32:17); (5) his Internet search history for people selling dangerous, toxic chemicals and his statements about his access to pure zinc and white phosphorous being sold "for an absurdly cheap price" (*Id.* at 12:56-13:16, 33:20-34:00); (6) his acknowledgement that his statements were "scary" and could be "terrifying" to people (*Id.* at 38:25-39:05); and (7) his feeling "really bad for making Morgan feel this unsafe." (*Id.* at 38:24- 38:36). ROA.1023. Loyola filed a reply memorandum. ROA.1027-1042.

Although Sahs had not raised the issue, the District Court *sua sponte* ordered supplemental briefing on whether Article 971 applied in federal court in view of *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010); *Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019); and Judge Graves's dissent in *Cuba v. Pylant*, 814 F.3d 701 (5th Cir. 2016). ROA.1048. The parties filed supplemental briefs as ordered. ROA.1055-1067; ROA.1068-1096.

### C.    The District Court denies Loyola's Article 971 motion.

In written Order and Reasons, the District Court denied Loyola's Article 971 motion without addressing its merits, upon concluding that Article 971 conflicts with the Federal Rules and does not apply in federal court. ROA.1097-1117.

Applying "Louisiana law because Louisiana's policies would be most seriously impaired if its law were not applied," the District Court acknowledged *Henry*'s holding that "Louisiana law, including the nominally-procedural Article 971, governs this diversity case." ROA. 1104, 1108. Citing *Lozovyy v. Kurtz*, 813 F.3d 576, 583-585 (5th Cir. 2015), and *Block v. Tanenhaus*, 815 F.3d 218, 221 (5th Cir. 2016), the Court further recognized that Article 971's "'probability of success' standard does not permit courts to weigh evidence, assess credibility, or resolve disputed issues of material fact,'" that "'a non-movant's burden in opposing an Article 971 motion to strike is the same as that of a non-movant opposing summary

10

judgment under Rule 56,'" and "that Article 971 does not conflict with Rule 56 and thus does not present an *Erie* issue." ROA.1106, 1109.

Despite acknowledging *Henry* and its progeny, the District Court concluded that Article 971 conflicted with Rules 12 and 56. ROA.1107-1117. Applying the Supreme Court's conflict analysis in *Shady Grove*, the District Court noted that the Fifth Circuit in *Klocke* and Judge Graves in his dissent in *Cuba* had concluded that the Texas anti-SLAPP statute was inapplicable in federal diversity actions, because it imposed additional "evidentiary weighing requirements" not present in the Federal Rules—including a requirement that the court must determine whether the plaintiff had "clear and specific evidence" to meet each element of his claim—and because the Texas statute attempted to answer "the same question" as the Federal Rules, *i.e.*, whether the court could dismiss the case before trial. ROA.1107-1115.

Although recognizing that *Klocke* had "distinguished *Henry* based on its application of Louisiana's Article 971 rather than the Texas statute," the District Court concluded that "*Klocke* precludes this Court from applying Article 971 in this diversity jurisdiction action." ROA.1113. According to the District Court, "Article 971 conflicts with Rule 12 by allowing a court to consider and weigh evidence rather than assuming the allegations in the complaint are true" and "mandates a different burden shifting framework from Rule 56." ROA.1115-1116.

11

## SUMMARY OF ARGUMENT

The District Court erroneously denied Loyola's special motion to strike upon concluding that Article 971 conflicts with Fed. R. Civ. P. 12 and 56 and does not apply in federal court. In *Henry*, the Fifth Circuit held that Article 971 indeed applies in a diversity action under the *Erie* doctrine. 566 F.3d at 168-169. Loyola's Article 971 motion does not conflict with Rule 12. Loyola did not seek a dismissal on Sahs's complaint alone, and both parties submitted affidavits and extrinsic evidence, which under Rule 12(d) would effectively convert a Rule 12 motion to dismiss into a Rule 56 summary-judgment motion. And in *Block* and *Lozovyy*, the Fifth Circuit held that the parties' shifting burdens are the "same" under Article 971 and Rule 56 under equivalent, non-conflicting summary-judgment standards.

The District Court was duty-bound to follow *Henry*, *Block*, and *Lozovyy*, which have never been overruled *en banc* or by the Supreme Court. The Court's refusal to apply Article 971 in this diversity action contravenes those binding precedents. Nothing in the Supreme Court's *Shady Grove* decision—which concerned a New York class-action statute in conflict with Rule 23—changes *Henry* and its progeny or prevents Article 971 from applying here. Likewise, the Fifth Circuit's distinguishable *Klocke* opinion and Judge Graves's dissent in *Cuba*— which analyzed the different Texas anti-SLAPP statute in conflict with Rules 12 and 56—do not affect controlling Fifth Circuit law enforcing Article 971.

12

Under the indisputable material facts, Loyola's Constitutionally protected statements and actions were privileged, reasonable, truthful, and devoid of actual malice concerning Sahs's criminal investigation and arrest—a matter of public interest under Article 971. Sahs has no countervailing evidence sufficient to support any of his claims as a matter of law. On *de novo* review, this Court should reverse the District Court's ruling, grant Loyola's Article 971 motion, dismiss all of Sahs's claims, and remand for an award of attorney's fees and costs to Loyola.

## ARGUMENT

### I.   A *de novo* standard of review applies.

This Court reviews *de novo* "questions of law, such as whether and how Article 971 applies." *Block*, 815 F.3d at 220. On its merits, "an Article 971 special motion to strike presents a question of law," and this Court likewise "reviews de novo a district court's ruling on an Article 971 motion." *Henry*, 566 F.3d at 169.

### II.  The District Court erred in refusing to apply La. C.C.P. art. 971 in this diversity action.

#### A.   Under binding Fifth Circuit precedents in *Henry* and its progeny, Article 971 applies in this case and does not conflict with the Federal Rules.

On appeal from the denial of an Article 971 motion, the Fifth Circuit unequivocally held in *Henry* that "Louisiana law, including the nominally-procedural Article 971, governs this diversity case." 566 F.3d at 168-69 (citing *Erie*,

13

304 U.S. at 78). In support, the Fifth Circuit further cited Ninth Circuit decisions holding that California's similar anti-SLAPP law applies in federal court under the *Erie* doctrine. *Id.* at 169 (citing *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972-73 (9th Cir. 1999); *Thomas v. Fry's Electronics, Inc.*, 400 F.3d 1206, 1207 (9th Cir. 2005).

Merely because Article 971 is in the Louisiana Code of Civil Procedure does not prevent it from applying in a diversity action as a matter of state "procedure." As the Fifth Circuit held in *Henry*, it is a "nominally-procedural" article that applies in federal court as substantive state law under *Erie*. 566 F.3d at 168-69. Article 971—whose purpose is to "weed out and dismiss" meritless claims that chill "the exercise of First Amendment rights"—is an important statute that furthers "the substantial public interest of protecting those exercising their First Amendment rights" and "embodies a legislative determination that parties should be immune from certain abusive tort claims that have the purpose or effect of imperiling First Amendment rights." *Henry*, 566 F.3d at 169-170, 177-78, and 180-81. Article 971 provides defendants "a right not to stand trial" and "not to bear the costs of fighting a meritless defamation claim." *Id.* at 178.

In *Henry*, the Fifth Circuit concluded that the defendant had made its prima facie showing and that plaintiff had not shown a probability of success as the Louisiana anti-SLAPP statute required, reversed the district court's denial of the

Article 971 motion, dismissed the plaintiff's defamation claim, and remanded the matter for a determination of attorney's fees and costs under Article 971(B). *Id.* at 181-83. Since *Henry*, Louisiana federal courts have repeatedly applied Article 971 in diversity actions. S*ee, e.g.*, *Collins v. WAFB, LLC*, 2017 WL 1383948, *2-9 (E.D. La. Apr. 18, 2017); *Brown v. Wimberly*, 2011 WL 5438994, *1-2 (E.D. La. Nov. 9, 2011), *aff'd*, 477 Fed. Appx. 214, 216-17 (5th Cir. 2012); *Armington v. Fink*, 2010 WL 743524, *3-7 (E.D. La. Feb. 24, 2010). Loyola filed its Article 971 motion according to *Henry* and its progeny.

The District Court erroneously held that Article 971 conflicts with Rule 12 by "allowing courts to consider and weigh evidence," rather than analyzing the complaint's allegations "without looking to external evidence." ROA.1113-1114. Loyola's Article 971 motion does not even impact, much less conflict with Rule 12. Loyola did not seek a dismissal on Sahs's complaint alone. Consistent with Article 971(A)(2), both parties submitted affidavit evidence, documents, and video and audio recordings outside of Sahs's complaint, which would effectively convert a Rule 12 motion to dismiss into a Rule 56 summary-judgment motion in any event. *See* Fed. R. Civ. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

The District Court further erroneously concluded that Article 971 "mandates a different burden shifting framework from Rule 56" and "conflicts" with it. ROA.1114, 1116. In *Lozovyy v. Kurtz*, the Fifth Circuit recognized that under Louisiana law Article 971 motions are "akin to [ ] motion[s] for summary judgment" and that "[u]ltimately *Henry* frames the 'probability of success' standard [of Article 971] as 'akin to a court determining only that a plaintiff has presented a threshold showing that allows her claim to proceed' by making a 'prima facie showing of facts to sustain a favorable judgment.'" 813 F.3d at 583-85. *Lozovyy* noted that this "[t]his approach to Article 971 is consistent with" the California courts' approach "in applying their 'virtually identical' anti-SLAPP statute" and that Louisiana courts "have looked to California precedent in interpreting Louisiana's provisions," which is "persuasive in predicting how the Louisiana Supreme Court would construe Article 971's 'probability of success' standard." *Id.* at 584. *Lozovyy* held that Louisiana's summary-judgment standard is "'closely in line with the federal standard'" under Rule 56 and that "the Louisiana Supreme Court would recognize that Article 971's 'probability of success' standard does not permit courts to weigh evidence, assess credibility, or resolve disputed issues of material fact." *Id.* at 585-86 (citations omitted).

In *Block v. Tanenhaus*, the Fifth Circuit again rejected the argument that Article 971 "requires the non-movant to meet a stricter burden than that imposed by"

16

Rule 56 and therefore does not apply in federal court. 815 F.3d at 221. The *Block* decision noted that in *Henry* the Fifth Circuit "previously applied Article 971 in a diversity case;" stated that under *Lozovyy* "a non-movant's burden under Article 971 is *functionally equivalent* to that under Rule 56;" and held that Article 971 "provides *the same standard* as Rule 56; thus there is *no conflict* on that basis." *Id*. at 221 and n.2 (emphasis added).

Article 971(D), which stays discovery pending an Article 971 motion except for good cause, does not materially differ from Rule 56(d) or prevent the Louisiana statute from applying in this case. Sahs agreed to stay discovery under Article 971 in the district court. ROA.1044. And discovery is unnecessary, because the evidence material to Loyola's Article 971 motion is indisputable. In *Henry*, the Fifth Circuit likewise enforced Article 971(B)'s provisions for attorney's fees and costs in federal court. 566 F.3d at 183. Rule 56 contains no conflicting provision. Louisiana law awards attorney's fees allowed by statute or contract. *See*, *Sher v. Lafayette Ins. Co.*, 07-2441, 07-2443 (La. 7/7/08), 988 So.2d 186, 201. Article 971(B) is the statute authorizing their recovery here.

The District Court must follow a "legally indistinguishable" Fifth Circuit decision that is not overruled by this Court *en banc* or by the Supreme Court. *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121 and n. 8 (5th Cir. 1992). The *Henry* decision—which holds that Article 971 applies in a diversity case

17

in federal court under *Erie*—has never been overruled by the Fifth Circuit *en banc* or by the Supreme Court, and it is the controlling Fifth Circuit precedent here. And under *Lozovyy* and *Block*, which likewise remain binding as Fifth Circuit law, the non-movant's burden is the "same" under Article 971 and Rule 56, and the Court decides an Article 971 motion under summary-judgment standards that do not conflict with the Federal Rule. In concluding otherwise and refusing to apply Article 971, the District Court has reversibly erred, contrary to these controlling Fifth Circuit precedents.

## B. The Supreme Court's decision in *Shady Grove* does not prevent Article 971 from applying in this case.

Instead of following Fifth Circuit law directly on point under Article 971, the District Court misapplied the distinguishable *Shady Grove* decision. Nothing in *Shady Grove* changes *Henry* and its application of Article 971 in federal court under the *Erie* doctrine.

In *Shady Grove*, the plaintiff filed a class action against the defendant insurer in federal court based on diversity jurisdiction to recover unpaid statutory interest allegedly owed to the class members on their insurance claims under New York law. 559 U.S. at 397. The Supreme Court considered whether a New York statute prohibiting class actions to recover "statutory penalties" applied in federal court to bar the class action, even though Fed. R. Civ. P. 23 governing the requirements for

class actions contained no such prohibition. *Id*. at 396-399. In a 4-4-1 plurality decision, Justice Scalia's majority opinion employed a "framework" that was "familiar" to decide this issue: "We must first determine whether Rule 23 answers the question in dispute. . . . If it does, it governs—New York's law notwithstanding—unless it exceeds statutory authorization or Congress's rulemaking power." *Id*. at 398 (citing *Burlington Northern R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987), and *Hanna v. Plumer*, 380 U.S. 460, 463-464 (1965)).

Under "the appropriate test for resolving conflicts between state law and the Federal Rules" set forth in *Hanna*, "[t]he initial step is to determine whether" the particular Federal Rule's scope "is 'sufficiently broad' to cause a 'direct collision' with the state law or, implicitly, to 'control the issue' before the court, thereby leaving no room for the operation of that law." *Burlington Northern R. Co.*, 480 U.S. at 4-5 (citing *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-750, and n. 9 (1980)). If such a conflict or collision exists, "[t]he Rule must then be applied if it represents a valid exercise of Congress' rulemaking authority, which originates in the Constitution and has been bestowed on this Court by the Rules Enabling Act, 28 U.S.C. § 2072." 480 U.S. at 5 (citing *Hanna*, 380 U.S. at 471-474).

The *Shady Grove* majority held that Rule 23, a valid rule of federal procedure under 28 U.S.C. § 2072(a), controlled the case and that the New York statute, which prevented the class action, did not apply in federal court. 559 U.S. at 396-416. It

concluded that Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action" and conflicts with the New York class-action statute, which imposed "additional requirements" on the same threshold class-action question, i.e., "whether a class action may proceed for a given suit." *Id*. at 398-401. The policies of Rule 23 and the New York statute were incompatible, "flatly contradict each other," and presented an unavertable "collision with state law." *Id*. at 405-406.

When the Federal Rules and the state law at issue do not directly conflict, however, the aforementioned test under "the *Hanna* analysis does not apply," and the Court instead applies the policies underlying *Erie* to determine if the state law applies in federal court in a diversity action. *Walker*, 446 U.S. at 752-753. "[T]he twin aims of the *Erie* rule" are "discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna*, 380 U.S. at 468. "[U]nder *Erie* and its progeny," when a federal court decides whether to apply state law in a diversity case, "the importance of a state rule is indeed relevant, but only in the context of asking whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum State," or whether the state rule's application "would have so important an effect upon the fortunes of one or both of

the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court."  380 U.S. at 468 and n. 9.

In *Newsham*, which the Fifth Circuit cited as authority for applying Article 971 in *Henry*, the Ninth Circuit stated that the threshold question in determining if the similar California anti-SLAPP statute properly applies in federal court was "whether such an application would result in a 'direct collision' with the Federal Rules."  190 F.3d at 972 (citing *Walker*, 446 U.S. at 749-50).  The Ninth Circuit held that the California statute and the Federal Rules coexist and did not collide:

> If unsuccessful, the litigant remains free to bring a Rule 12 motion to dismiss, or a Rule 56 motion for summary judgment. We fail to see how the prior application of the anti-SLAPP provisions will directly interfere with the operation of Rule 8, 12, or 56. In summary, there is no "direct collision" here.

*Id.*  The *Newsham* court then considered *Erie*'s aims and held that the California anti-SLAPP statute applied in federal court, because it furthered "important, substantive state interests" that were "not directly addressed by the Federal Rules"— namely "the protection of 'the constitutional rights of freedom of speech'"—and because "the twin purposes of the *Erie* rule—'discouragement of forum-shopping and avoidance of inequitable administration of the law'—favor application of California's Anti-SLAPP statute in federal cases" to discourage plaintiffs from shopping for a federal forum to avoid the fees-and-costs provision of the state statute and to deprive the defendant of its protections.  190 F.3d at 973.

21

In *CoreCivic, Inc. v. Candide Group, LLC*, 46 F.4th 1136, 1138 (9th Cir. 2022), the Ninth Circuit reiterated these principles and held that the Supreme Court's decision in *Shady Grove* was not "clearly irreconcilable" with the Ninth Circuit's "long line of precedents holding that California's anti-SLAPP statute applies in federal court" and did not require overruling those prior decisions. The *CoreCivic* opinion reaffirmed *Newsham* in finding no conflict between the state anti-SLAPP law and the Federal Rules, noted that the Ninth Circuit has continued to apply the California statute in federal diversity actions since *Shady Grove*, and concluded that—in determining whether a Federal Rule answers the "same question" as the state law at issue—the *Shady Grove* majority applied the same "direct collision" analysis employed in *Newsham*. *Id.* at 1140-1143.

The Ninth Circuit in *CoreCivic* noted that "under a *Shady Grove* analysis" in *Godin v. Schencks*, 629 F.3d 79, 86 and 91 (1st Cir. 2010), the First Circuit had quoted *Newsham*'s reasoning with approval in applying Maine's anti-SLAPP statute in federal court. *CoreCivic, Inc.,* 46 F.4th at 1143. Indeed, the First Circuit cited both *Henry* and *Newsham* as exemplary decisions applying Louisiana's and California's anti-SLAPP statutes in federal-court actions. 629 F.3d at 81 and 91.

In *Godin*, the First Circuit correctly recognized that the majority opinion in *Shady Grove* "uses the language of 'potential conflict,' 'compatible' and 'collision with state law'" and "characterizes the first step of the analysis as 'determining

22

Case: 25-30263    Document: 41    Page: 34    Date Filed: 06/30/2025

whether the federal and state rules can be reconciled (because they answer different questions).'" 629 F.3d at 87-88. The *Godin* court held that Rules 12(b)(6) and 56 "are not so broad as to cover the issues within the scope of" the Maine anti-SLAPP statute, which "does not seek to displace the Federal Rules" or have them "cease to function" as a "substitute to the Federal Rules." *Id*. at 88. Rather, the state statute is a "supplemental and substantive rule" that "serves the entirely distinct function of protecting those specific defendants that have been targeted with litigation on the basis of their protected speech." *Id*. at 88-89. A motion under Maine's statute— which permits the court "to look beyond the pleadings to affidavits and material of record" and allows specific discovery for good cause—"will be resolved just as summary judgment motions under Fed.R.Civ.P. 56 are," and the state statute's discovery provision "is consistent with the allocation of burdens under Rule 56(d), formerly Rule 56(f)." *Id*. at 90.

Thus, the *Godin* court concluded that Rules 12 and 56 were not intended to "'occupy the field with respect to pretrial procedures aimed at weeding out meritless claims,'" but that "[r]ather, Rules 12 and 56 'can exist side by side'" with the Maine anti-SLAPP statute, "'each controlling its own intended sphere of coverage without conflict.'" 629 F.3d at 91 (quoting *Newsham*, 190 F.3d at 972, and further citing *Henry*, 566 F.3d at 169-170, as "enforcing Louisiana's anti-SLAPP statute in federal court"). The First Circuit held that applying the Maine statute in federal court

"would best serve the 'twin aims of the *Erie* rule'" to prevent "an inequitable administration of justice" denying the defendant the Maine statute's special protections and defenses, including "attorney's fees or costs," and to remove strong "incentives for forum shopping." *Id*. at 91-92.

Likewise, under the same "familiar" analysis or "framework" applied in *Shady Grove*, the issue of the "applicability" of La. C.C.P. art. 971 in federal courts is a question whether Article 971 conflicts with or is in "direct collision" with the Federal Rules of Civil Procedure. Under *Henry* and persuasive decisions from the Ninth and First Circuits, no such conflict exists, and Article 971 applies in federal court under an *Erie* analysis. In protecting First Amendment rights, Article 971 "provides for the avoidance of a trial that that would imperil a substantial public interest," and "'there is little room for the judiciary to gainsay its 'importance.'" *Henry*, 566 F.3d at 180-81. *See also*, *Brown*, 2011 WL 5438994 at *1 (stating that in *Henry* the Fifth Circuit "has recognized the validity of anti-SLAPP statutes in federal court" and "is joined" by the First and Ninth Circuits in *Godin* and *Newsham*); *Armington*, 2010 WL 743524 at *3 and n.2 ("Article 971 does not directly collide with Rule 56."). Unlike the New York class-action statute in *Shady Grove*, Article 971 poses no conflict with the Federal Rules. Nothing in *Shady Grove* changes *Henry*'s holding that Article 971 applies in federal court.

24

### C. The Fifth Circuit's decision in *Klocke* and Judge Graves's dissent in *Cuba* do not prevent Article 971 from applying in this case.

In *Klocke v. Watson*, citing *Shady Grove*'s analysis, the Fifth Circuit held that the Texas anti-SLAPP statute cannot apply in federal court, because its "burden-shifting framework imposes additional requirements beyond those found in Rules 12 and 56 and answers the same question as those rules."  936 F.3d at 245. The *Klocke* opinion noted that "[i]n contrast to the federal procedural requirements," the Texas anti-SLAPP statute—which requires the court to determine "by a preponderance of the evidence" whether the plaintiff has "clear and specific evidence" to prove each element of his claim— "imposes additional requirements that demand judicial weighing of evidence" under a standard "that exceeds the plaintiff's Rule 56 burden to defeat summary judgment" and thereby "conflicts" with the Federal Rules. 936 F.3d at 246.  In his dissent in *Cuba v. Pylant*, Judge Graves had also concluded that the Texas anti-SLAPP statute conflicted with the Federal Rules and was inapplicable in federal court under the *Shady Grove* analysis.  814 F.3d at 718-721.

Importantly, in ruling that the Texas anti-SLAPP statute does not apply in a diversity action, the Fifth Circuit in *Klocke* acknowledged that in *Henry* it had applied La. C.C.P. art. 971 in federal court "pursuant to the *Erie* doctrine." 936 F.3d

at 244 and 248.  The *Klocke* panel distinguished *Henry*, noted differences between

the Louisiana and Texas anti-SLAPP statutes, and did not overrule *Henry*:

> Although this question is not free from doubt, we conclude
> that *Henry* is not binding on this panel under our rule of
> orderliness. *United States v. Boche-Perez*, 755 F.3d 327, 334 (5th Cir.
> 2014) ("[A] panel of the court cannot overturn a prior panel decision
> absent an intervening change in the law ....") (quotation marks
> omitted). *Henry* interprets a different statute, albeit a different version
> of an anti-SLAPP statute. The two states' laws differ in that Texas
> imposes higher and more complex preliminary burdens on the motion
> to dismiss process and imposes rigorous procedural deadlines. The
> conflict between the Texas law and the Federal Rules is manifest, while
> the comparable conflict between the Federal Rules and Louisiana law
> is less obvious.

*Id.* at 248-249 and n. 7 (citing *Block*, 815 F.3d at 221, which held that the non-

movant's burdens to oppose an Article 971 motion and a Rule 56 summary-judgment

motion are "the same"). Indeed, as discussed above, in *Block* and *Lozovyy* the Fifth

Circuit held that Article 971—which does not allow the court to weigh evidence,

assess credibility, or resolve disputed issues of material fact—comports with Rule

56 and does not conflict with it.  In contrast, *Klocke* held that the Texas anti-SLAPP

statute imposes a higher burden of proof by clear and specific evidence and requires

the court to weigh the evidence in conflict with Rule 56.  *Id.* at 246-48.  Despite

recognizing that *Klocke* had "distinguished *Henry* based on its application of

Louisiana's Article 971 rather than the Texas statute," the District Court erroneously

concluded here that "*Klocke* precludes this Court from applying Article 971 in this diversity jurisdiction action." ROA.1113.

The District Court further stated that *Klocke* had "highlighted *Henry*'s failure to consider 'the potential overlap or conflict between the Louisiana anti-SLAPP provision and the Federal Rules,' and noted that *Henry* preceded *Shady Grove*." ROA.1113. But in applying Article 971, the Fifth Circuit in *Henry* necessarily considered the Louisiana statute and the Federal Rules by citing *Newsham*, which had analyzed in detail the nearly identical California anti-SLAPP statute and held that it does not conflict with the Federal Rules. The *Shady Grove* majority applied the same methodology to determine whether a conflict exists that the Ninth Circuit employed in *Newsham* and reaffirmed in *CoreCivic*. And the Fifth Circuit perforce utilized it in *Henry* by citing *Newsham* and other Ninth Circuit cases as support for applying Article 971 under *Erie*. 566 F.3d at 168-69.

## III. This Court should reverse the District Court's order and render judgment on the appellate record granting Loyola's Article 971 motion.

Loyola's Article 971 Motion is ripe for a determination on the merits now in this Court. Sahs's own videotaped admissions of his threatening statements confirm that he cannot prevail on any of his claims. On the night of his arrest, Sahs admits on video: (1) to his history of bomb-making (*See* NOPD Video at 30:58-31:24 and 32:20-32:29); (2) that he "scarred [his] back" and had "chemical burns" from setting

27

off bombs he had made (*Id.* at 30:59–31:25 and 33:08–33:14); (3) his statements about "chemical weapons" and "bombs" to other students on his school-sponsored trip (*Id.* at 12:50-13:50); (4) his boasts of personally filming a bomb explosion in a Florida restaurant and showing students a video of it (*Id.* at 15:00-15:22 and 31:26-32:17); (5) his Internet search history for people selling dangerous, toxic chemicals and his statements about his access to pure zinc and white phosphorous being sold "for an absurdly cheap price" (*Id.* at 12:56-13:16, 33:20-34:00); (6) his acknowledgement that his statements were "scary" and could be "terrifying" to people (*Id.* at 38:25-39:05); and (7) his feeling "really bad for making Morgan feel this unsafe." (*Id.* at 38:24- 38:36).  ROA.1023.

Sahs's own admissions confirm the substantial truth of the privileged statements from the Loyola police department and *The Maroon* articles reporting on his arrest.  All of Sahs's alleged causes of action arise from Loyola's exercise of its Constitutional rights of free speech on a public issue under Article 971, and he has no viable claim against Loyola. No additional discovery can change that inevitable conclusion. Given the serious nature of Sahs' threatening statements, Loyola acted reasonably in suspending Sahs to protect its community from harm.

This case presents exactly the type of meritless claims that Article 971 was enacted to weed out.  On *de novo* review of the complete appellate record, this Court should render judgment as a matter of law, granting Loyola's Article 971 motion,

28

dismissing Sahs's claims, and remanding this case for an award of attorney's fees and costs to Loyola.  *See*, *Henry*, 566 F.3d at 181-183.

**A.     Loyola has Constitutional rights to freedom of speech.**

In opposition to Loyola's Article 971 motion, Sahs erroneously argued that Loyola, "a powerful, private institution," cannot invoke Article 971 and is using the First Amendment "as a smokescreen to dismiss a meritorious case."  ROA.945-946. His contentions are meritless.

Under Article 971(A)(1), "a person" may move to strike a cause of action against it "arising from any act of that person in furtherance of the person's right" of free speech "in connection with a public issue."   Sahs judicially admits that "Defendant Loyola is a private, co-educational, Jesuit university." ROA.641. (First Amended Complaint, ⁋ 3).  As a juridical person, Loyola has Constitutional rights to free speech.  *See*, *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 342-43 (2010) (rejecting the contention that "corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'"); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978) ("The inherent worth of the speech in terms of informing the public does not depend on the identity of its source, whether corporation, association, union, or individual."); *McGarry v. University of San Diego*, 64 Cal. Rptr. 3d 467, 483-88 (Cal App. 4 Dist. 2007) (granting a university's anti-SLAPP motion); *Columbia*

*Union College v. Clarke*, 159 F. 3d 151, 155-156 (4th Cir. 1998) (recognizing a church-affiliated college's First Amendment rights).

### B.     Loyola's speech about Sahs's arrest concerned a matter of public interest.

Sahs further wrongly contended that this action concerns his arrest for "misdemeanor stalking" in a matter that was "not newsworthy" as "a one-sided 'dispute' between two private individuals" and that is not "in connection with a public issue" under Article 971. ROA.959-960, 963-964.  In denying a stay pending appeal, the District Court also erroneously stated that this case "does not implicate the public interest because it is a dispute between a private individual and a private university." *See* Rec. Doc. 74 at pages 6-7.

Article 971, which is broadly construed, protects freedom of speech relating to matters of public significance and interest from the chilling effect of abusive lawsuits. 1999 La. Acts, No. 734, § 2; *Henry*, 566 F.3d at 169-170.  La. C.C.P. art. 971(F)(1)(c)-(d) defines an "[a]ct in furtherance of a person's right of ... free speech under the United States or Louisiana Constitution in connection with a public issue" as including "[a]ny written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" or "[a]ny other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue

of public interest." Speech involves public concern when it relates "to any matter of political, social, or other concern to the community" or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011); *Connick v. Myers*, 461 U.S. 138, 146 (1983). ("[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick*, 461 U.S. at 145. *See also*, *Shelton v. Pavon*, 17-0482 (La. 10/18/17), 236 So.3d 1233, 1241 (interpreting "in connection with a public issue" in Article 971 by quoting *Connick*).

Sahs's criminal investigation and arrest after his classmate complained to police that he was stalking her and making statements that he could mix chemicals that could kill Loyola students are indisputably matters of public interest. "Criminal activity is certainly a matter of concern to the community and the subject of legitimate news interest." *Collins v. WAFB, LLC.*, 2017 WL 1383948, *4 (E.D. La. Apr. 18, 2017) (Report of arrest for issuing worthless checks was of public interest under Article 971). *See also*, *Kennedy v. Sheriff of East Baton Rouge*, 05-1418 (La. 7/10/06), 935 So.2d 669, 677 (Report to law enforcement that college student was attempting to use suspected counterfeit currency at drive-through restaurant was speech of public concern.); *Johnston v. NOE Corp. L.L.C.*, 46,647 (La. App. 2 Cir. 11/23/11), 81 So.3d 735, 740-41, *writ denied*, 11-2838 (La. 3/2/12), 84 So.3d 532

31

(Report of criminal investigation of student's claim of sexual assault "concerned a matter of public significance" and "of public interest.").

Loyola's speech and conduct about Sahs's criminal investigation and arrest on allegations affecting the safety of Loyola students indeed concern an issue of public interest under Article 971. Any contrary conclusion would lead to fundamental prejudicial errors preventing the Court from properly applying Article 971's requirements, tainting its entire analysis of the elements of Sahs's claims, and wasting judicial resources by applying the wrong legal standards.

### C.    Sahs cannot establish a probability of success on any of his claims.

Sahs has adduced no evidence sufficient to carry his burden under Article 971(A)(1) "to demonstrate a probability of success" on each of the claims alleged.

### 1.    Sahs has no viable claim in defamation.

The elements of a Louisiana defamation claim are: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Johnson v. Purpera*, 20-1175 (La. 5/13/21), 320 So.3d 374, 386-87. *See also*, *McIntyre v. Gilmore*, 2015 WL 2250210, *3 (E.D. La. May 13, 2015) ("'[A] defamation plaintiff must produce evidence of sufficient quality and quantity to demonstrate that he will be able to meet his burden of proof at trial.'") (citation omitted). Sahs has no such evidence.

32

### a.    Sahs must prove falsity and malice.

When speech by law enforcement officers and the news media concerns a matter of public interest, the plaintiff must prove falsity and fault. *See*, *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986).   *See also*, *Spears v. McCormick & Co., Inc.*, 520 So.2d 805, 808 (La. App 3 Cir. 1987), *writ denied*, 522 So.2d 563 (La. 1988) (Where plaintiffs "are private figures and the article involved dealt with a matter of public concern (alleged wife beating) . . . the requirements of *Hepps* are applicable and the plaintiffs would have the burden of proving falsity."). The First Amendment's protections of the media supersede "the common law presumptions of fault, falsity, and damages with respect to speech involving matter of public concern.*" Kennedy*, 935 So.2d at 677.

Under Louisiana law, the "fault" requirement is generally "malice." *Johnson*, 320 So.3d at 387.   Actual malice must be proved with "clear and convincing evidence that the alleged defamatory statements were made with knowing and reckless falsity." *Tarpley v. Colfax Chronicle*, 94-2919 (La. 2/17/95), 650 So.2d 738, 740; *Kidder v. Anderson*, 354 So.2d 1306, 1308 (La. 1978), *cert. denied,* 439 U.S. 829 (1978).  "[R]eckless disregard [for the truth] is typically found where a story is fabricated by the defendant, is the product of his imagination, or is so inherently improbable that only a reckless man would have put it in circulation." *Kennedy*, 935 So.2d at 689.  Actual malice does not exist "where the information has been obtained

from an informant in a position to know the information published and where there is no clear and convincing evidence that the person publishing the information had any personal knowledge unequivocally indicating the unreliability of his informant." *See*, *Kidder*, 354 So.2d at 1309.

In matters of public concern, the "malice" requirement must be actual, not implied. *Johnson*, 320 So.3d at 389 (reiterating that "defamation by implication or innuendo . . . is actionable only if the statements regard a private individual *and* private affairs" and that "[w]here public affairs are concerned, the publication of true statements is encouraged and there can be no civil or criminal liability for such, regardless of ill-will or improper motive on the part of the speaker." (emphasis in original); *Collins*, 2017 WL 1383948 at *7-8 (no defamation by implication in a case involving a private individual and a matter of public concern).

### b.    Sahs cannot prove falsity and malice in Sgt. Bell's privileged statements to a reporter about Sahs's arrest.

Sahs cannot possibly prove "fault" or "malice" concerning Sgt. Bell's privileged statements to student-reporter Witt about Sahs's alleged possession of chemicals and Sgt. Bell's reasonable, good-faith belief that additional charges against Sahs were forthcoming concerning "terroristic" threats.

Police have a qualified privilege under the First Amendement "in their role as law enforcement officers reporting the facts of an investigation and a resulting arrest

to the press and, in turn, to the public." *Trentecosta v. Beck*, 96-2388 (La. 10/21/97), 703 So.2d 552, 564. An officer only abuses the privilege by making "unfounded" statements "pertaining to guilt that were not developed in the investigation" and "that the officer had no reason to believe were true." *Id*.

Concerning proof of "fault" or "malice" where a law enforcement officer reports about an on-going criminal investigation to the press, the *Trentecosta* court specifically found that the plaintiff must prove that the officer's comments are essentially a "story fabricated by the defendant or a product of the defendant's imagination." *Id.* at 562. In *Trentacosta*, Officer Smith abused his qualified privilege through a statement accusing the plaintiff of "bilking" money from charitable organizations that "was not based on information furnished to Smith by investigators, by an informant, or by anyone else, but was apparently created by Smith." *Id.* at 562-564. In contrast, another state trooper in *Trentacosta*, Officer Jones, did not act with reckless disregard and did not abuse his privilege by reporting to the media information that he had learned from another policeman (Officer Beck) that Trentacosta was conducting an illegal gaming operation. *Id*.

To defeat the qualified privilege, Sahs must show that Sgt. Bell had no reason to believe that his statements were true. Sahs cannot possibly satisfy that burden, as he has adduced no evidence that Sgt. Bell acted with actual malice or abused his privilege by expressing his reasonable belief that additional charges against Sahs

might be forthcoming. Sgt. Bell's statements in good faith to Witt about Sahs were not fabricated or imagined. He reasonably based them on information he had received from the NOPD about Matteson's criminal complaint alleging that Sahs had made threatening statements that he could mix dangerous chemicals that could kill people. ROA.904-906. (Bell Affidavit, ¶¶ 9, 12-14, 18). In the recording, Sgt. Bell tells Witt that he was providing "background" on the situation. ROA.1014. Sgt. Bell's comments about Sahs's investigation and arrest are privileged and made without evidence of "malice." *See*, *Dyas v. Shreveport Police Dept.*, 48,804 (La. App. 2 Cir. 2/26/14), 136 So.3d 897, 905, *writ denied*, 14-0909 (La. 1/23/15), 159 So.3d 1055 (Police officers' statements "to the media concerning the investigation and the arrest are subject to a qualified privilege" absent evidence that they "knew their statements were false or that they had a high degree of awareness that the statements were probably false.").

Sahs attempts to circumvent Sgt. Bell's qualified privilege by alleging that he is Loyola's "private security employee." ROA.654-655. (First Amended Complaint, ¶¶ 62-68). But that mischaracterization does not diminish his legal status as an active State-commissioned police officer. ROA.903. (Bell Affidavit, ¶ 3). Under La. R.S. 17:1805(A)(1) and (2), campus police officers at state or private universities are "commissioned" by the Louisiana "Department of Public Safety" with authority to carry out the duties of police officers on campus. *See*, *Evans v. Interim LSU Public*

*Hospital*, 13-1085 (La. App. 1 Cir. 4/28/14), 2014 WL 1691343, *1, *writ denied*, 14-1278 (La. 9/26/14), 149 So.3d 266 (noting that to be a university police officer "requires a commission" under Section 1805(A)(2)).

Furthermore, State-commissioned police officers have immunity under La. R.S. 9:2798.1(B) "based upon … their … discretionary acts when such acts are within the course and scope of their lawful powers and duties." *Cf.*, *Martin v. State, Dept. of Public Safety and Corrections, Office of State Police*, 47,647 (La. App. 2 Cir. 1/16/13), 109 So.3d 442, 449-450 (no statutory immunity where police were performing a non-discretionary duty under La R.S. 32:398 to report accident-related information to news-gathering agencies). Unquestionably, Sgt. Bell was performing a "discretionary" act when he spoke in good faith to a journalist about Sahs's arrest, and he has immunity under La. R.S. 9:2798.1 in addition to his qualified privilege.

### c. Sahs cannot prove falsity and malice in student reporter Kloe Witt's privileged article in *The Maroon*.

Sahs has likewise failed to prove actual malice concerning Witt's *Maroon* article based on her conversation with Sgt. Bell. Witt had a qualified privilege to report on what he told her about Sahs's arrest and investigation, and she reported it accurately. *See*, *Martin*, 109 So.3d at 448–49 ("A qualified privilege also extends to the fair reporting of investigations or arrests."); *Bates v. Times-Picayune Publishing Corp.*, 527 So.2d 407, 411 (La. App. 4 Cir. 1988), *writ denied*, 532 So.

2d 136 (La. 1988) (extending the fair-reporting privilege to information from the police, whether derived from an official report or an official spokesperson).

Additionally, when a news publisher relies upon statements made by law enforcement, even when they are false and defamatory *per se*, the publisher will not be held liable for defamation. *See, e.g.*, *Collins*, 2017 WL 1383948 at *5-6 (granting an Article 971 motion by a media defendant who relied upon law-enforcement press release: "Defendant was under no duty to verify the information before publishing it and Plaintiff has not demonstrated a probability of success in proving fault or otherwise established a genuine dispute of material fact as to Defendant's fault."); *Thomas v. City of Monroe*, 36,526 (La. App. 2 Cir. 12/18/02), 833 So.2d 1282, 1288-89 (granting an Article 971 motion where a news publisher had a qualified privilege and acted without malice in relying upon a police report); *Wilson v. Capital City Press*, 315 So.2d 393, 397-98 (La. App. 3 Cir. 1975), *writ denied*, 320 So.2d 203 (La. 1975) (Reporter had no duty to verify information in State Police's news release incorrectly including plaintiff's name in a list of arrestees in a drug raid.). Witt had a privilege to report on what Sgt. Bell told her about Sahs's investigation and arrest and had no duty to independently verify it.

Further, when an article's "gist" is accurate, it is not defamatory. *See Collins*, 2017 WL 1383948 at *6 (*citing Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1073 (5th Cir. 1987) ("A publication is also protected if it is 'substantially true,' *i.e.*,

if it varies from the truth only in insignificant details or if its 'gist' or 'sting' is true."). The "gist" of the Witt's article centers on its statements: (1) "Loyola police said Sahs was in possession of chemical materials that can be used to kill people" and (2) "LUPD said they believe he will be brought up on terroristic threat charges as well." ROA.913. Indisputably, Witt accurately reported these statements directly from her recorded conversation with Sgt. Bell.

Sahs cannot show falsity or fault (malice) on Loyola's part, because truth and privilege are valid and complete defenses precluding a defamation claim. *See*, La. R.S. 13:3602; *Cyprien v. Board of Supervisors for the University of Louisiana System*, 08-1067 (La. 1/21/09), 5 So.3d 862, 867. The article's truth is unquestionable, because Witt recorded her conversation with Sgt. Bell, who indeed spoke of Sahs's alleged statements that he possessed and could mix chemicals to harm others and of his own belief that Sahs will face additional charges related to terrorism. *See*, *Wyatt v. Elcom of La., Inc.*, 34,786 (La. App. 2 Cir. 6/22/01), 792 So.2d 832, 835-36 (Televison station was not liable for accurately reporting law enforcement's "stance" during a criminal investigation and "that the police believed Wyatt fired the fatal shot, and that police accuse, charge, think, and believe Wyatt killed Franks."). Witt's article truthfully reported exactly what Sgt. Bell said about Sahs's investigation and arrest.

In her *Maroon* article, Witt also referred to social-media posts:

39

> LUPD said Sahs made social media posts about the student who
> completed the report, spreading personal information about them such
> as the individual's nationality and family.

ROA.913. Sahs argues that the article incorrectly quoted Sgt. Bell as saying that Sahs's statements on social media revealed information about the nationality and family of the victim who had filed the stalking complaint, when Sgt. Bell actually had said that Sahs was making statements about himself and his own family: "[H]e started to go on social media and talk about things like where his parents are from, his nationality. . . ." ROA.1014. When Witt's and Bell's statements are juxtaposed, however, this minor mistake in Witt's article does not rise to the level of actual malice. First, the social-media reference is irrelevant to Sahs's allegation that he was defamed by being accused of having dangerous chemicals and might face charges related to terrorism threats. Second, Sgt. Bell's remark was consistent with the NOPD incident report, which included Matteson's allegation that "Mr. Sahs claimed he was the decedents [sic] of Nazis that had escaped the Nuremberg trials to Argentina, and that his personal beliefs aligned with the Nazi party." ROA.729. Witt's mistaken report that Sahs posted about the victim was favorable to Sahs, because it said nothing about his alleged claim to be a Nazi descendant and sympathizer. It does not prove actual malice or change the article's "gist."

When a publication accurately reports a statement that turns out to be false, the plaintiff must establish that the reporter "was at fault by knowingly publishing a

40

false statement, that is, that he published it with malice." *Perniciaro v. McInnis*, 19-0671 (La. App. 4 Cir. 4/1/20), 293 So.3d 1144, 1154, *writ denied*, 20-00492 (La. 7/2/20), 297 So.3d 767. "[T]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Hakim v. O'Donnell*, 49,139, 49,140 (La. App. 2 Cir. 6/25/14), 144 So.3d 1179, 1189, *writ denied*, 14-1501 (La. 11/7/14), 152 So.3d 175, *cert. denied*, 575 U.S. 936 (2015) (citing *St. Amant v. Thompson,* 390 U.S. 727 (1968)). "Mere negligence concerning falsity (or lack of reasonable grounds for believing the statement to be true) is not sufficient to prove abuse of the conditional privilege. Instead, knowledge or reckless disregard as to falsity is necessary for this purpose." *Id*. Here, no evidence indicates that Witt had any reason to doubt Sgt. Bell's information.  Sahs cannot prove "fault" or "malice."

### d.    Sahs cannot prove falsity and malice in faculty advisor Michael Giusti's privileged amended article in *The Maroon*.

Sahs likewise has no evidence to prove actual malice in Professor Michael Giusti's revised *Maroon* article on March 16, 2023.  ROA.745; ROA.915 (Giusti Affidavit, ¶10).  Sahs alleges that it is defamatory because it falsely states the contents of NOPD Officer Coleman's Affidavit for Arrest Warrant of Sahs. ROA.668. (First Amended Complaint, ¶¶ 104-105). Sahs so contends because Officer

Coleman's Incident Report (ROA.729.)—not his Affidavit for Arrest Warrant (ROA.730-31.)—referred to Sahs's alleged ability to mix dangerous chemicals.

In the amended *Maroon* article, Giusti does mistakenly state that "[NOPD Officer Coleman's] affidavit claimed Sahs was in possession of chemical materials," whereas Officer Coleman's Incident Report, not his Affidavit, contained those allegations. *See* ROA.745; ROA.915-916. (Giusti Affidavit, ¶¶11-13). But that mistake in terminology is not actionable.

"In reporting matters of public interest involving legal and judicial proceedings and records some errors and inaccuracies are bound to occur. . . . In order to avoid a 'chilling effect' on the exercise of First Amendment rights, the media must be allowed 'breathing space.'" *Hopkins v. Keith*, 348 So.2d 999, 1002 (La. App. 2 Cir. 1977), *writ not considered*, 350 So.2d 893 (La. 1977) (An article was "substantially true" and not defamatory where it confused the plaintiff's decision to forfeit a bond with an actual conviction.). *See also*, *Bill Partin Jewelry, Inc. v. Smith*, 467 So.2d 188, 189-90 (La. App. 3 Cir. 1985) (No defamation in report that plaintiff "stole silverware taken in a local home burglary," even though he was "charged with receiving stolen property."); *I.I. Rosen v. Capital City Press*, 314 So.2d 511, 512-16 (La. App. 1 Cir. 1975) (Article was substantially true where it stated that a doctor was indicted for illegally distributing "narcotics," even though the drugs at issue were not "narcotics" but were "stimulants.").

Giusti's simple, honest mistake in legal terminology is not defamatory. He had a privilege to report on these matters, and he did not abuse it in misnaming the police document containing the allegations against Sahs. Giusti believed that the NOPD Incident Report "was part of the materials submitted by Officer Coleman in connection with his Affidavit for Arrest Warrant." ROA.916. (Giusti Affidavit, ¶ 13). In fact, the Incident Report's narrative section refers to Matteson's "detailed digital journal of the incidents with Mr. Sahs" and states that "[d]ue to Miss Matteson's statements and records, Officer Coleman issued a warrant for the arrest of Mr. Sahs" for stalking. ROA.729. And the Affidavit states that Officer Coleman was shown "a detailed journal … of all of the statements that Mr. Sahs had made" and was requesting a warrant "due to victim[']s statements and notes provided." ROA.730-31. Giusti, a non-lawyer, could easily have confused the Incident Report with the Affidavit, as they cross-reference each other in referring to Matteson's statements and journal. Further, as Exhibit IV to his First Amended Complaint, Sahs attached copies of his "booking documents," which included the Incident Report and the Affidavit for Arrest Warrant together. ROA.653, 727-732. Giusti's harmless mistake was one that any lay person could make in reviewing the NOPD documents.

Nor can Sahs prove falsity or fault concerning Giusti's amended article, because its "gist" is substantially true. The NOPD Incident Report, which Matteson's digital journal corroborated, refers to her observations of Sahs's claimed chemical

43

burns and her allegations that Sahs had made detailed, threatening remarks that he knew how to build bombs and chemical warfare devices and mix dangerous chemicals that could kill people in a Loyola dormitory. ROA.729. The Affidavit for Arrest Warrant likewise refers to Matteson's "detailed journal" of "all" of Sahs's statements. ROA.730-31. The "gist" of Giusti's article truly stated that Sahs was charged with stalking and that the police had received a claim that he was in possession of chemical materials that can be used to kill people. ROA.745.

Sahs cannot possibly prove that Loyola acted with "actual malice" under these facts and established law. Sahs has admitted to making disturbing and threatening statements that resulted in his stalking arrest and led to *The Maroon* articles. Further, Loyola accurately quoted Sgt. Bell in its original article, and in the amended article withdrew some of his statements. A willingness "to print a retraction weighs against 'malice.'" *See*, *Zerangue*, 814 F.2d at 1071 (citation omitted). *A fortiori*, a willingness to remove true statements to soften the article does the same.

### 2.    Sahs has no viable claims in negligence, negligent infliction of emotional distress, or vicarious liability.

Sahs likewise cannot prove a probability of success on any of his additional claims alleging negligence, negligent infliction of emotional distress, and vicarious liability. They all arise from Loyola's acts in furtherance of its free-speech rights within the scope of Article 971, and he cannot prove all their required elements.

44

Louisiana law generally defines negligence "as conduct which falls below the standard established by law for protection of others against unreasonable risk of harm." *Dobson v. La. Power & Light Co.*, 567 So.2d 569, 574 (La. 1990).  The plaintiff must prove all these elements: (1) defendant owed a duty to the plaintiff; (2) defendant breached the duty; (3) defendant's sub-standard conduct was a cause-in-fact of the plaintiff's injuries; (4) defendant's sub-standard conduct was a legal cause of the plaintiff's injuries; and (5) plaintiff sustained actual damages. *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94), 646 So.2d 318, 321-322.

In his negligence claim, Sahs alleges a duty and breach that are identical to and derivative of his unfounded defamation claims.  He asserts that Loyola failed to exercise reasonable care and violated journalists' and news associations' codes of ethics for verifying information and sources, and devised, published, and disseminated "defamatory language and words that disparaged and defamed" Sahs's character as a student, failed "to ascertain that the published statements regarding Plaintiff Luke Sahs are false and defamatory," suspended Sahs "based on *inter alia* unfounded, false reasons and pretenses," and mishandled confidential information enabling Loyola's police department "to share details of Sahs' arrest warrant with The Maroon newspaper, contributing to the false, defamatory narrative that resulted in the defamatory articles in The Maroon."  *See* ROA.692-693 (First Amended Complaint, ¶¶ 194-195).  As discussed above, Sgt. Bell had a privilege as a law-

45

enforcement officer to discuss alleged campus crime with the media, and Witt and Giusti had privileges as journalists to rely on his information without independently verifying it. In his derivative "negligence" claim against Loyola, Sahs simply relabels his unfounded defamation claims.

Similarly, Sahs has no viable claim for negligent infliction of emotional distress, which is also derivative of his failed defamation claim. *See*, *Phillips v. L. Brands Service Company, L.L.C.*, 82 F.4th 291, 303 and n. 14 (5th Cir. 2023) ("[Because it] is derivative of his defamation and malicious prosecution claims, it must fail for the same reasons.") (citing *Kelly v. West Cash & Carry Bldg. Materials Store*, 99-0102 (La. App. 4 Cir. 10/20/99), 745 So.2d 743, 760).

Under *respondeat superior* or vicarious liability, employers and teachers are answerable for offenses and damages caused by their employees and students, but that responsibility only attaches when they might have prevented the damage-causing act. La. C. C. art. 2320. Having no viable claim against any Loyola employee or student, Sahs cannot hold Loyola vicariously liable for anything. *See also*, *Milliner v. Turner,* 436 So.2d 1300, 1302 (La. App. 4 Cir. 1983), *writ denied*, 442 So.2d 453 (La. 1983) ("The First Amendment pre-empts and would take precedence over operation of La. Civ. Code art. 2320 with regard to a university's right to and degree of control over its student publications."). Sahs has no

countervailing evidence to create a genuine issue of material fact, and he cannot satisfy his burden under Article 971 or Rule 56 through allegations and arguments.

In denying a stay pending appeal, the District Court erroneously remarked that Sahs "has alleged causes of action in tort and breach of contract that do not implicate Article 971" and that "these claims will remain even if Loyola's appeal is successful." *See* Rec. Doc. 74 at page 6. Sahs's alleged theories of recovery all arise from his defamation claim and fall within Article 971's scope. *See*, *Jambon v. Queen Bess Bay Owners Association, Inc.*, 21-626 (La. App. 5 Cir. 12/33/21), 2021 WL 5830057, *2 (Where the petition alleges multiple claims, "courts examine the probability of success of each claim individually."); *Darden v. Smith*, 03-1144 (La. App. 3 Cir. 6/30/04), 879 So.2d 390, 395-96, *writ denied*, 04-1955 (La. 11/15/04), 887 So.2d 480 (recognizing that Article 971 is not limited to a cause of action in defamation, that Article 971(A)(1)'s "broad" language applies to "[a] cause of action against a person *arising* from any act of that person in furtherance of the person's right of petition or free speech," and that "all of the causes of action alleged by the plaintiff's petition are subject to the motion to strike if the merits of that motion are established") (emphasis supplied by court); *McIntyre*, 2015 WL 2250210 at *3-4 (granting an Article 971 motion and dismissing defamation, false-light invasion of privacy, and conspiracy claims).

Article 971(A)(1) "clearly speaks in terms of striking a 'cause of action,' or 'claim,' rather than a 'suit' or 'action,'" nothing in its text indicates "that a special motion to strike need necessarily be an 'all or nothing' proposition," Article 971 plainly "*can* be utilized to strike an individual cause of action," and courts "independently analyze" and apply Article 971 to "*each* cause of action challenged in the special motion to strike." *La. Crisis Assistance Center v. Marzano-Lesnevich*, 878 F.Supp.2d 662, 667-68 (E.D. La. 2012) (on reconsideration) (emphasis by the court); *Painter v. State Through Office of Governor*, 18-1289 (La. App. 1 Cir. 12/26/18), 2018 WL 6807124, *1, *writ denied*, 19-0283 (La. 4/8/19), 267 So.3d 610, *cert. denied*, 140 S.Ct. 224 (2019) (granting an Article 971 motion in part and dismissing certain claims). Similarly, Rule 56(a) allows a party to move for summary judgment on identified claims. Here, all of Sahs's claims are within Article 971's scope, and none survives Loyola's motion to strike.

### 3. Sahs has no viable claims for breach of contract or the covenant of good faith and fair dealing.

Sahs likewise cannot establish a probability of success on his claims for breach of contract and the covenant of good faith and fair dealing. ROA.697-701. (First Amended Complaint, ¶¶ 209-230). Sahs asserts that Loyola "committed numerous investigative and procedural missteps, failed to engage in impartial fact finding, failed to fairly weigh evidence" that he would have presented, "and, on

48

information and belief, harbored an overall institutional gender bias against Plaintiff Sahs as a male student." ROA.699. (*Id*., ¶ 220). He alleges that Loyola breached its Student Code of Conduct, "the guarantees of due process and fundamental fairness, and its implied covenant of good faith and fair dealing" and deprived him "of his contractual rights to due process and equal protection through the improper administration of the Student Code of Conduct hearing process in violation of" its "own guidelines and regulations." ROA.699-700. (*Id*., ¶¶ 221-222). He further alleges that Loyola "breached and violated a covenant of good faith and fair dealing implied in its contract . . . by meting out an unjust, malicious suspension and sanction against" him, despite lacking evidence that he possessed chemical materials or dangerous, deadly weapons, and "acted with malice or arbitrarily". ROA.700-701. (*Id*., ¶¶ 227-228). The law and indisputable facts refute those allegations derivative of his defamation claims and arising from Loyola's protected speech, acts, and conduct under Article 971 in suspending Sahs.

The plaintiff must prove (1) that a contract exists between the parties; (2) that the defendant breached it; and (3) that the breach caused some loss to the plaintiff. La. C. C. art. 1994; *Sam's Style Shop v. Cosmos Broadcasting Corp.,* 694 F.2d 998, 1005 (5th Cir. 1983). "The breach of a contractual duty cannot be presumed." *Morgavi v. Mumme,* 270 So.2d 540, 542-43 (La. 1972); *Sam's Style Shop*, 694 F.2d at 1003.

Good faith governs the parties' conduct concerning the obligation. La. C.C. art. 1759. Contracts "have the effect of law for the parties" and "must be performed in good faith." La. C.C. art. 1983. The covenant of good faith cannot override or contradict the contract, and its breach requires proof of "bad faith or ill motive." *Clark v. America's Favorite Chicken Co.,* 110 F.3d 295, 297-98 (5th Cir. 1997). It does not elevate a contract into a fiduciary duty. *Terrebonne Concrete, LLC v. CEC Enterprises, LLC,* 11-0072 (La. App. 1 Cir. 8/17/11), 76 So.3d 502, 510, writ denied, 11-2021 (La. 11/18/11), 75 So.3d 464. Its breach requires "that the defendant's actions were prompted by fraud, ill will, or sinister motivation." *Shafiq v. Ochsner Health Sys.*, 2019 WL 1199755, *8 (E.D. La. Mar. 13, 2019) (citations omitted). "A mere failure to fulfill an obligation, without a showing of intent or ill will, does not constitute a breach of good faith." *Id*. "[B]ad faith means more than bad judgment or negligence" and "implies the conscious doing of a wrong for dishonest or morally questionable motives." *Id*. at *9.

A private university's regulations may become part of its contractual relationship with its students. *Doe v. Loyola University*, 2020 WL 1030844, *9 (E.D. La. Mar. 3, 2020). But "'the plaintiff must do more than merely allege that a promise was inadequately performed; plaintiff must point to an identifiable contractual promise that the defendant failed to honor.'" *Id*. (citation omitted). "The

Court then considers whether the university made an objective good faith effort to perform on its contractual promise." *Id.*

Assuming that the Student Code of Conduct is a contract between Sahs and Loyola, he has not shown that Loyola breached a contractual promise or acted fraudulently or with ill will. First, Sahs's claims that Loyola denied him due process and equal protection cannot succeed as a matter of law. Loyola is a private university neither clothed with state action nor acting under color of state law. *Blouin v. Loyola University*, 506 F.2d 20, 21-22 (5th Cir. 1975); *Doe v. Loyola University*, 2020 WL 1030844, at *8. It is not subject to constitutional due-process rights and "must have broad discretion in determining appropriate sanctions for violations of its policies." *Doe v. Trustees of Boston College*, 942 F.3d 527, 534-35 (1st Cir. 2019). *See also, Doe v. Loyola University*, 2020 WL 1030844 at *9 (recognizing its broad discretion in disciplining students).

Second, Sahs has no support for his speculative allegation that Loyola "harbored an overall institutional gender bias against Plaintiff Sahs as a male student." ROA.699. (First Amended Complaint, ¶ 220). Sahs has not filed a Title IX claim, nor produced any evidence to carry his burden under 20 U.S.C. §1681(a) to prove that he was treated unequally or discriminated against because of his gender, even if he had pleaded it. *See, Plummer v. Univ. of Houston*, 860 F.3d 767, 777 (5th Cir. 2017) (Plaintiff must prove that "regardless of the student's culpability, the

51

severity of the penalty and/or the university's decision to initiate proceedings was affected by the charged student's gender."). Loyola does not consider a student's gender in making its good-faith, unbiased decision under the Code of Conduct to issue an interim suspension pending a criminal charge. ROA.918, 921-930. (Flint Affidavit, ¶ 6 and Code attached thereto as Exhibit 4A). Without countervailing evidence, Sahs's gender-bias claim cannot succeed.

Third, Sahs has no evidence that Loyola breached the Code of Conduct by imposing his interim suspension. Under the Code, "a student accepts Loyola's rules and acknowledges the right of the University to take action, up to and including suspension or dismissal." ROA.918, 921. (Flint Affidavit, ¶ 7 and Code, p. 1). The Code provides that Loyola has jurisdiction over Code violations for alleged misconduct, including alleged stalking and threats of violence, that Loyola's "designated representative has sole discretion and final authority to take interim action, without prior notice, for reasons relating to the safety or welfare of students, faculty or staff," including "suspension" and "restrictions on University privileges, access, and activities," that in Loyola's discretion Code proceedings "may be carried out prior to, simultaneously with, or following civil or criminal proceedings," and that Code sanctions "will not be subject to challenge on the grounds that civil or criminal charges involving the same incident are pending or have been dismissed,

reduced, or resolved in favor of or against the student." ROA.918-919, 922-923. (Flint Affidavit, ¶ 8, Code, pp. 2-3).

On March 3, 2023, Sahs was charged with stalking, and the Orleans Parish Magistrate Court issued protective orders "to remain in effect until the disposition of this case," requiring him to "stay away" and "keep off the Loyola University campus as well." ROA.734. After Sahs's arrest, the Code and the Court's orders authorized his interim suspension pending his criminal charge, which affected the safety of Loyola students. ROA.919. (Flint Affidavit, ¶¶ 9-10).

Fourth, Sahs waived his right to complain of Loyola's actions. Loyola agrees "to provide all of those accused of violating this Code of Conduct with written notice of the provision(s) of the Code they are accused of violating, a right to provide their version of events, and the right to appeal as described within this Code." ROA.919, 926. (Flint Affidavit, ¶ 12, Code, p. 6). "A student placed . . . on interim suspension will be given 48 hours to present information in writing" to Loyola "in support of a claim that the terms of the interim suspension should be modified," Loyola's representative "has sole discretion and final authority to modify or confirm the interim suspension," and "[t]he terms of the interim suspension will remain in effect unless they are modified in writing." ROA.923 (Flint Affidavit, ¶ 13, Code, p. 3). Loyola gave Sahs written notice of his interim suspension, but no information came forward within 48 hours requesting to modify it. ROA.920. (Flint Affidavit, ¶ 14).

Sahs returned to Florida and later withdrew as a Loyola student on April 20, 2023, before any suspension hearing was scheduled. ROA.920. (Flint Affidavit, ¶ 15). He requested no relief under the Code and has waived its available procedures.

## CONCLUSION

The District Court has erroneously refused to apply La. C.C.P. art. 971 in this diversity action and has misconstrued the Louisiana law's requirements. For the foregoing reasons, on *de novo* review, this Court should reverse the District Court's order and render judgment on the appellate record, granting Loyola's special motion to strike under Article 971, dismissing all of Sahs's claims, and remanding the matter to the District Court to assess and award Loyola attorney's fees and costs.

Respectfully submitted,

*/s/ Charles D. Marshall, III*
Julie D. Livaudais (La. Bar No. 01183)
Charles D. Marshall, III (La. Bar No. 27564),
*Appeal Counsel*
Douglas L. Grundmeyer (La. Bar No. 06362)
CHAFFE McCALL, L.L.P.
1100 Poydras Street
2300 Energy Centre
New Orleans, LA 70163-2300
Telephone: (504) 585-7000
Facsimile: (504) 585-7075
Email: livaudais@chaffe.com
         marshall@chaffe.com
         grundmeyer@chaffe.com

***Attorneys for Defendant-Appellant,***
***Loyola University New Orleans***

54

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2025, the foregoing Brief of Defendant-Appellant was electronically transmitted to the Clerk of this Court using the CM/ECF System for filing and that service was accomplished through the Notice of Electronic Filing on the following ECF users:

Andrew C. Stebbins
Christina N. Williams
Buckingham Doolittle & Burroughs LLC
1375 E. 9 th Street, Suite 1700
Cleveland, OH 44114
astebbins@ bdblaw.com
cwilliams@bdblaw.com

John W. Carpenter, Esq.
Law Offices of John W. Carpenter, LLC
201 St Charles Ave., Suite 2500
New Orleans, LA   70170
 john@jwcarpenterlaw.com

Elizabeth Bagert Carpenter, Esq.
Law Office of Elizabeth Bagert Carpenter
201 St Charles Ave., Suite 2500
New Orleans, LA   70170
ebe@neworleans-criminal-defense.com

*Attorneys for Plaintiff-Appellee, Luke G. Sahs*

*/s/  Charles D. Marshall, III*
*Attorney for Defendant-Appellant,*
*Loyola University New Orleans*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) and 5th Cir. R. 32.2 because it contains 12,987 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 software in Times New Roman 14-point font, except for the footnotes, if any, which are in proportionally spaced type-face, including serifs, using Word in Times New Roman 12-point font.

*/s/ Charles D. Marshall, III*
*Attorney for Defendant-Appellant,*
*Loyola University New Orleans*

Dated: June 30, 2025

# <u>ADDENDUM OF LA. C.C.P. ART. 971</u>

Under Fed. R. App. P. 28(f), defendant-appellant, Loyola University New Orleans, submits this addendum containing La. C.C.P. art. 971, which this Court must study to determine the issues that this appeal presents:

## Art. 971. Special motion to strike

A.    (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.

(2) In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

(3) If the court determines that the plaintiff has established a probability of success on the claim, that determination shall be admissible in evidence at any later stage of the proceeding.

B.    In any action subject to Paragraph A of this Article, a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs.

C.    (1) The special motion may be filed within ninety days of service of the petition, or in the court's discretion, at any later time upon terms the court deems proper.

(2) If the plaintiff voluntarily dismisses the action prior to the running of the delays for filing an answer, the defendant shall retain the right to file a special motion to strike within the delays provided by Subparagraph (1) of this Paragraph, and the motion shall be heard pursuant to the provisions of this Article.

(3) The motion shall be noticed for hearing not more than thirty days after service unless the docket conditions of the court require a later hearing.

D.     All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this Article.  The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. Notwithstanding the provisions of this Paragraph, the court, on noticed motion and for good cause shown, may order that specified discovery be conducted.

E.     This Article shall not apply to any enforcement action brought on behalf of the state of Louisiana by the attorney general, or city attorney acting as a public prosecutor.

F.     As used in this Article, the following terms shall have the meanings ascribed to them below, unless the context clearly indicates otherwise:

(1) "Act in furtherance of a person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue" includes but is not limited to:

(a) Any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law.

(b) Any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official body authorized by law.

(c) Any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest.

(d) Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

(2) "Petition" includes either a petition or a reconventional demand.

(3) "Plaintiff" includes either a plaintiff or petitioner in a principal action or a plaintiff or petitioner in reconvention.

(4) "Defendant" includes either a defendant or respondent in a principal action or a defendant or respondent in reconvention.

Added by Acts 1999, No. 734, § 1.  Amended by Acts 2004, No. 232, § 1; Acts 2012, No. 449, § 1.