IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
--------------------------------------------
No. 25-30263
--------------------------------------------
Luke G. Sahs,
Plaintiff-Appellee,
v.
Loyola University New Orleans,
Defendant-Appellant.
-------------------------------------------------------------

On Appeal from the United States District Court
for the Eastern District of Louisiana
Civil Action No. 2:24-cv-01379
Hon. Susie Morgan, Judge Presiding
-------------------------------------------------------------

**BRIEF OF PLAINTIFF-APPELLEE
LUKE G. SAHS**

Andrew C. Stebbins (OH Bar No. 0086387)
Admitted *pro hac vice*
Buckingham Doolittle & Burroughs LLC
1375 E. 9th Street, Suite 1700
Cleveland, OH 44114
Office Telephone: (216) 736-4233
Email: astebbins@bdblaw.com

John W. Carpenter (La. Bar No. 03940)
Law Offices of John W. Carpenter, LLC
201 St Charles Ave., Suite 2500
New Orleans, LA. 70170
Office Telephone: (504) 599-5955
Cell: (415) 577-0698
Email: john@jwcarpenterlaw.com

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. Luke G. Sahs, plaintiff-appellee;

2. Andrew C. Stebbins, Christina N. Williams, and the law firm of Buckingham Doolittle & Burroughs LLC, attorneys for plaintiff- appellee;

3. John W. Carpenter and the Law Office of John W. Carpenter, LLC, attorneys for plaintiff-appellee;

4. Elizabeth Bagert Carpenter and the Law Office of Elizabeth Bagert Carpenter, attorneys for plaintiff-appellee;

5. Victoria Elisabeth Brieant and the law firm Law Office of Victoria E. Brieant, attorneys for plaintiff-appellee Luke G. Sahs;

6. Loyola University New Orleans, defendant-appellant; and

7. Julie D. Livaudais, Charles D. Marshall, III, Douglas L. Grundmeyer, Rosalie M. Haug, and the law firm of Chaffe McCall, L.L.P., attorneys for defendant-appellant.

By: /s/ Andrew C. Stebbins
Andrew C. Stebbins
(Ohio Bar No. 0086387) (*pro hac vice*)
Buckingham Doolittle & Burroughs LLC
1375 E. 9th Street, Suite 1700
Cleveland, OH 44114
Office Telephone: (216) 736-4233
Email: astebbins@bdblaw.com

John W. Carpenter (La. Bar No. 03940) Law Offices of John W. Carpenter, LLC 201 St Charles Ave., Suite 2500
New Orleans, LA. 70170

Office Telephone: (504) 599-5955
Cell: (415) 577-0698
Email: john@jwcarpenterlaw.com

*Attorneys for Plaintiff–Appellee*
*Luke G. Sahs*

# <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to 5th CIR. R. 28.2.3, Plaintiff-Appellee, Luke G. Sahs, respectfully requests oral argument. This appeal will require the Court to decide for the first time whether La. Code. Civ. Proc. Article 971 may not be applied in a suit in federal court based on diversity jurisdiction. Oral argument would assist the Court in evaluating the issues presented in this case.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES ....................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS............................................................................... iv

TABLE OF AUTHORITIES ........................................................................ vi

STATEMENT OF THE ISSUES ....................................................................1

STATEMENT OF THE CASE.......................................................................1

SUMMARY OF THE ARGUMENT ...............................................................5

ARGUMENT AND AUTHORITIES..............................................................7

I.      Article 971 Does Not Apply in Federal Court ...................................7

   A.  Article 971's Procedure for Pretrial Dismissal through a Motion to Strike...7

   B.  Article 971 is Subject to Scrutiny Under *Erie* and *Shady Grove* and their Progeny and this Court Has Yet to Perform Such an Analysis. ...........................9

      1.      Article 971 is a Procedural Article. ......................................16

      2.      Because Article 971 Answers the Same Question as Rules 12 and 56, Even if Article 971 is Substantive, It Cannot Be Applied.............................17

II.     Even if Article 971 Were Applicable, Loyola's Motion Would Fail on the Merits. ..............................................................................................25

   A.  The Standard for Denying an Article 971 Motion to Strike. .....................25

   B.  Sahs has a Viable Claim in Defamation Related to the Second Article. ...26

C. Sahs has a Viable Claim in Defamation Related to the March 2, 2023 First Libel Article and Picture ....................................................................34

D. Facts in Dispute for the Jury to Decide.....................................................40

E. Separate Causes of Actions Not Associated with the Motion to Strike Pursuant to Article 971 May Proceed, As Determined by the District Court. 41

1.Causes of Action Not Arising from Acts in Furtherance of the Right of Petition or Free Speech in connection with a Public Issue Cannot be Dismissed under Article 971...................................................................41

2.Plaintiff-Appellee Sahs will Prevail on his Claims for Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing. ..........................42

3.Sahs Has Met His Burden on His Negligence-Based Claims. .................46

III. Conclusion ...................................................................................................48

CERTIFICATE OF SERVICE ................................................................................51

CERTIFICATE OF COMPLIANCE .......................................................................52

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C.Cir. 2015) .......... passim

*All Plaintiffs v. All Defendants,* 645 F.3d 329 (5th Cir. 2011) ...............................10

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91
L.Ed.2d 202 (1986) ...................................................................................22

*Ashcroft v. Iqbal*, 556 U.S. 662, , 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)..........19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)...............................................19

*Block v. Tanenhaus* ("*Block I*"), 815 F.3d 218 (5th Cir. 2016) ...................... 6, 26, 40

*Block v. Tanenhaus* ("*Block II"*)*,* 867 F.3d 585 (5th Cir. 2017) ..........................7, 12

*Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987)
........................................................................................................................12

*Carbone v. Cable News Network, Inc.*, 910 F.3d 1345 (11th Cir. 2018) . 6, 9, 12, 14

*Celotex Corp. v. Catrett*, 477 U.S. 317106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).....22

*CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136 (9th Cir. 2022) ...................15

*Cuba v. Pylant*, 814 F.3d 701 (5th Cir. 2016) ...................................... 13, 17, 18, 19

*Curtis Publishing Co*. v. *Butts*, 388 U.S. 130 .......................................................39

*Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)....9, 16

*Estiverne v. Times-Picayune, L.L.C.*, 950 So.2d 858 (La.App. 4th Cir. 2006) .......11

*Fitzgerald v. Tucker*, 98–2313 (La. 6/29/99), 737 So.2d 706. ...............................27

*Frigon v. Universal Pictures, Inc.* 2017-0993 (La. 6/21/18), 255 So.3d 591, 602. 26

*Godin v. Schenks*, 629 F.3d 79 (1st Cir. 2010) ................................................. 14, 25

*Godin v. School Union 134*, 2009 WL 1686910 (D.Me. June 16, 2009)...............25

*Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) ......................9

*Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164 (5th Cir. 2009) ................................................................................................ passim

*Hoffman v. Washington Post. Co.*, 433 F. Supp 600 (D.C. 1977) ...........................28

*Hogan v. Williams*, 18-620 (La. App. 5 Cir. 5/23/19), 274 So. 3d 762, 768...........27

*Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026 (N.D. Ill. 2013), aff'd, 791 F.3d 729 (7th Cir. 2015) ............................................................ 12, 14

*Jacobs v. National Drug Intelligence Center*, 548 F.3d 375 (5th Cir. 2008) ...........13

*Kennedy v. Sheriff of East Baton Rouge*, 2005–1418 (La.7/10/06), 935 So.2d 669. ................................................................................................................27

*Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019) ............................................. passim

*Kosmitis v. Bailey*, 28,585 (La.App. 2 Cir. 12/20/96), 685 So.2d 1177..................28

*La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020) ....................................................9, 14

*Lee v. Pennington,* 830 So. 2d 1037 (La. Ct. App. 2002)........................................17

*Lexington Ins. Co. v. S.H.R.M. Catering Servs., Inc.,* 567 F.3d 183 (5th Cir. 2009) ................................................................................................................19

*Lozovyy v. Kurtz,* No. 3:13–CV–00424, 2015 WL 331804 (M.D.La. Jan. 26, 2015) ................................................................................................................23

*Lozovyy v. Kurz*, 813 F.3d 576 (5th Cir. 2015)....................................... 6, 15, 26, 40

*Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1188 (9th Cir. 2013).....................12

*Mariana v. Magnolia Auto Transp., LLC*, 21-447 341 So. 3d 1281 (La. App. 5 Cir. 5/26/22) ................................................................................................39

*Mathieu v. Imperial Toy Corp.,* 94-952, pp. 4-5 (La. 11/30/94), 646 So.2d 318, 322................................................................................................................46

*Mitchell v. Hood*, 614 Fed.Appx. 137 (5th Cir.2015)...............................................6

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828

(9th Cir.), amended, 897 F.3d 1224 (9th Cir. 2018)...................................... 15, 24

*Roper v. Loupe*, 2015-1956 La.App. 1 Cir. 10/28/16 (La.App.) ...........................24

*Russ v. International Paper Co.,* 943 F.2d 589, 591 (5th Cir.1991) ......................21

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* 559 U.S. 393 (2010) ...5, 11, 20

*Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S. Ct. 422, 85 L. Ed. 479 (1941)............25

*Spencer v. Valero Ref. Meraux, LLC*, 356 So. 3d 936 (La. 2023)..........................47

*St. Amant v. Thompson,* 390 U.S. 727 (1968)............................................. 34, 39, 40

*Tah v. Glob. Witness Publishing, Inc.*, 991 F.3d 231 (D.C. Cir. 2021).. 9, 15, 16, 24

*Tarpley v. Colfax Chronicle*, 94-2919 (La. 2/17/95), 650 So. 2d 738.....................28

*Thomas v. Fry's Elecs.*, Inc., 400 F.3d 1206 (9th Cir. 2005)..................................10

*Trentecosta v. Beck* 703 So. 2d 552 (La. 1997)......................................................39

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999)...................................................................................................10

*Welborn v. State Farm Mut. Auto. Ins. Co.*, 480 F.3d 685 (5th Cir. 2007).............10

*Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066 (5th. Cir. 1987).......................28

## **Statutes**

D.C. Code § 16-5502 ....................................................................................... 16, 18

La. Code. Civ. Proc. Article 971.................................................................... passim

La. R.S. § 14:40.1 ...................................................................................................36

TCPA........................................................................................................................13

## **Rules**

Fed. R. Civ. P. 12 ............................................................................... 5, 12, 18, 19

Fed. R. Civ. P. 56 ..................................................................................... passim

## STATEMENT OF ISSUES

1. Whether the District Court properly denied Defendant-Appellant Loyola University New Orleans' Special Motion to Strike Plaintiff-Appellee Sahs's First Amended Complaint pursuant to La. Code. Civ. Proc. Article 971 ("Article 971") in a federal court exercising diversity jurisdiction given the procedural conflicts between Article 971 and Federal Rules 12 and 56, which render Article 971 inapplicable as a matter of law.

2. Whether *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* 559 U.S. 393 (2010), is "an intervening change in the law . . . [by] the Supreme Court", overturning the Fifth Circuit decision in *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164 (5th Cir. 2009), thus supporting the district court's order denying Loyola's Motion to Strike.

## STATEMENT OF THE CASE

In February 2023, Plaintiff-Appellee Luke G. Sahs ("Sahs"), a freshman at Defendant-Appellant Loyola University New Orleans ("Loyola"), accepted an invitation to participate in a weeklong, school-sponsored trip to Honduras to explore marine biology. (ROA.419.) The trip was a perfect educational opportunity for Sahs – a certified open water diver with a passion for marine biology. (ROA.418-419.) Only three other students signed up for the trip; and only one of those students was also certified for open water diving: Morgan Matteson ("Matteson"). (ROA.419.)

While Sahs and Matteson had never spoken to each other before the trip, they quickly became friends after being assigned as each other's dive partners. (ROA.419.) The other students on the trip observed the fast friendship between Sahs and Matteson, describing them as "inseparable" throughout the week. (ROA.419.) However, their interactions were those of a platonic friendship, not a romantic or sexual relationship. (ROA.420.) Matteson demonstrated to Sahs that she was comfortable with him by sharing highly personal information about her mental health struggles and prior treatment programs. (ROA.420.) Near the end of the dive trip, Sahs confirmed to Matteson that he was only looking for friendship. (ROA.420.) Sahs did not perceive this as a problem, and he believed he would remain friends with Matteson upon returning to Loyola. (ROA.420.) Unfortunately, Sahs was mistaken.

On March 2, 2023, after returning from Honduras, Matteson reported Sahs to the New Orleans Police Department ("NOPD"). (ROA.420.) Matteson told the NOPD that (1) Sahs admitted to "relentlessly stalking her;" (2) she "was fearful for her life;" (3) Sahs had bomb-making equipment in his dormitory room; (4) Sahs had chemical burns on his body; (5) Sahs is a Nazi; (6) Sahs is racist; (7) Sahs is a psychopath; and (8) Sahs published content about Matteson on social media. (ROA.420-421.) All of these statements are false and baseless. (ROA.420-421.) Matteson then filed a false complaint against Sahs with the NOPD for

2

*misdemeanor* "stalking." (ROA.421.)

On March 2, 2023 at 6:40 p.m., a confidential, non-public Arrest Warrant with supporting Affidavit of Arrest was issued and signed by an Orleans Parish Magistrate for Sahs's arrest for allegedly stalking Matteson. (ROA.421.) That same day the NOPD sent four officers to Loyola's campus to arrest Sahs. (ROA.424.) Two Loyola private security employees, one of whom was Sergeant Damon Bell ("Bell"), accompanied the four NOPD officers. (ROA.424, 949.) The NOPD officers and Loyola private security employees first went to Sahs's dormitory room, where the NOPD officers and Loyola private security employees conducted a search of Sahs's dormitory room in the presence of Sgt. Bell and found no chemical materials or weapons. (ROA.424-425.) The NOPD officers and Loyola private security employees next went to a Loyola dining room, where a NOPD officer arrested Sahs in the Loyola dining room. (ROA.425.)

At some point on March 2, 2023, after Sahs's arrest, Bell spoke with Kloe Witt ("Witt"), a Loyola student reporter for Loyola's Maroon Newspaper (the "Maroon"), at the LUPD police station. (ROA.428, 905.) Witt recorded Bell's statements. (ROA.429, 905.) Bell told Witt that: (1) Sahs "was in possession of chemical materials that can be used to kill people;" (2) "they believe [Sahs] will be brought up on terroristic threat charges;" and (3) Sahs "made social media posts regarding the student who completed the report, spreading personal information

regarding them such as the individual's nationality and family." (ROA.429.) At the time Bell made these statements, the search of Sahs's dormitory room, in which Bell participated and that revealed no weapons or dangerous materials, had been completed. (ROA.429.) The information concerning Sahs's arrest, arrest warrant, and affidavit for arrest was "confidential and not meant for public dissemination" at the time Bell made the statements to Witt. (ROA.430.)

Bell's statements to Witt were false and Bell knew them to be false. (ROA.429-430.) Bell made a copy of Sahs's arrest warrant and affidavit for arrest and gave it to Witt. (ROA.430.) Witt left the LUPD police station and wrote a news article for the Maroon. (ROA.431.)

On the evening of March 2, 2023, the Maroon published Witt's article (the "First Article") on the Internet. (ROA.431.) Witt's article contained the following false statements: (1) "Loyola police said [Sahs] was in possession of chemical materials that can be used to kill people;" (2) "LUPD said they believe [Sahs] will be brought up on terroristic threat charges;" and (3) "LUPD said [Sahs] made social media posts regarding the student who completed the report, spreading personal information regarding them [with] such as the individual's nationality and family." (ROA.431.) The article was foreseeably disseminated extensively. (ROA.432.)

On March 17, 2023, Loyola removed the First Article from the Maroon's

website and replaced it with a different article (the "Second Article") written by Michael Giusti ("Giusti"), Loyola's director of student media and a journalism professor. (ROA.442, 915.) The Second Article contained the defamatory statement that Sahs's arrest "affidavit claimed [Sahs] was in possession of chemical materials that can be used to kill people" – a republication of Bell's false assertion that Plaintiff "was in possession of chemical materials that can be used to kill people." (ROA.668, 671, 745.)·

The criminal stalking case against Sahs was dismissed on January 22, 2024 for lack of evidence. (ROA.672.) There were never any charges against Sahs related to weapons or chemical materials, as there were never any weapons or chemical materials in Sahs' possession. (ROA.672.)

## SUMMARY OF THE ARGUMENT

The District Court's Order denying Defendant-Appellant Loyola's Special Motion to Strike Plaintiff-Appellee Sahs's First Amended Complaint should be affirmed. Louisiana's Article 971 cannot be applied by federal courts sitting in diversity because, regardless of whether Article 971 is a procedural or substantive statute, it (1)"answers the same question" as Federal Rules of Civil Procedure 12 and 56, and (2) imposes additional burdens on the plaintiff to survive pre-trial dismissal not present within the Federal Rules. *See Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010); *Klocke v. Watson*, 936

F.3d 240 (5th Cir. 2019). This is impermissible. The Federal Rules are intended to provide a uniform and predictable framework and they "contemplate that a claim will [1] be assessed on the pleadings alone or [2] under the summary judgment standard; there is no room for any other device for determining whether a valid claim supported by sufficient evidence [will] avoid pretrial dismissal." *Klocke* at 247 citing *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1351 (11th Cir. 2018).

Further, contrary to Loyola's assertion, this Court's pre-2010 decision in *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164 (5th Cir. 2009 did not preclude the District Court from concluding that Article 971 is inapplicable in federal courts. As explained by this Court in *Klocke*, *Henry* was decided without the benefit of the intervening Supreme Court decision of *Shady Grove* and *Henry* did not address the overlap or conflict between the Louisiana anti-SLAPP provision and the Federal Rules. Further, post-*Shady Grove* decisions from this Court suggest that *Henry* did not definitively resolve the issue of whether Article 971 is applicable in federal courts. *Mitchell v. Hood*, 614 Fed.Appx. 137, 139 n. 1 (5th Cir.2015) (per curium) (declining to "decide whether Louisiana's anti-SLAPP law is appropriately asserted in a federal diversity case"); *Lozovyy v. Kurz*, 813 F.3d 576, 583-84 (5th Cir. 2015) (declining to address whether *Henry* actually decided the applicability of Article 971 in federal courts or collision with Rule 56 due to failure to raise below); *Block v. Tanenhaus* ("*Block I*"), 815 F.3d 218 (5th Cir. 2016) (declining to

"conclusively resolve ... whether Article 971 applies in diversity cases"); *Block v. Tanenhaus* ("*Block II*"), 867 F.3d 585, 589, n. 2 (5th Cir. 2017) (referring to issue as "unresolved" and stating "[w]e have noted on several occasions that this is an open question.") Accordingly, the District Court did not err in reaching the conclusion that pursuant to the guidance in *Shady Grove* and *Klocke*, Article 971 cannot apply in diversity actions.

Finally, while Loyola spends the bulk of its brief addressing the "facts" of the case and alleged merits of its motion to strike, that is not the issue before this Court and, to the extent the District Court did err as to the applicability of Article 971, this Court should remand the case to the District Court for a merits-based decision.

## ARGUMENT AND AUTHORITIES

I.      **Article 971 Does Not Apply in Federal Court**

A. Article 971's Procedure for Pretrial Dismissal through a Motion to Strike.

La. Code of Civ. P. art. 971 ("Article 971") provides a two-step procedure for defendants to seek early dismissal of covered claims through a "motion to strike."

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a **probability of success on the claim**.

(Emphasis added.) Article 971A(1). In ruling on the motion to strike under Article

7

971A, the court *must* consider submissions beyond the pleadings. Article 971A(2) ("the court shall consider… affidavits.")

Under the first step, the movant must only establish that Article 971 covers the activity giving rise to the suit; the standard does not require the movant to address the merits of the targeted claims – i.e. point to any alleged pleading deficiencies or the potential inability of the non-movant to satisfy one or more elements of a claim. If the movant's burden is met, then the non-movant must affirmatively establish the "probability of success" on any contested claim(s). "Probability of success" is undefined by statute, but is a greater burden than that imposed under the Federal Rules at the pleading stage. *Henry*, 566 F.3d at 181.

Further, it is presumed that the non-movant will meet their burden, including (if relevant, as it is here) showing a defendant's state of mind or fault, without undertaking any discovery due to an automatic stay provision. Article 971D. The non-movant can request to conduct "*specified* discovery," but can only obtain such specified discovery through making a noticed motion and showing "good cause." Even if "good cause" is demonstrated, the court *is not required to authorize this limited discovery. See Id.* (Court "*may* order that specified discovery be conducted" upon motion and good cause showing.)

In short, under the two-step expedited dismissal procedure of Article 971, once the defendant shows that the actionable conduct is "covered" by the statute, a

plaintiff is forced to establish – at the inception of the case and without the benefit of discovery – the "probability of success" on the merits of their claims through external evidence.  Under the guidance of *Shady Grove* and its progeny, courts have found similar anti-SLAPP schemes impermissibly collide with the Federal Rules – even when the statutes are judicially re-written to conform to the burden of a non-movant under Rule 56.[1] The same result should occur here because – regardless of whether Article 971 is identified as procedural or substantive – Article 971 is at odds with the scheme set forth by the Federal Rules for pretrial dismissal.

      B. <u>Article 971 is Subject to Scrutiny Under *Erie* and *Shady Grove* and their Progeny and this Court Has Yet to Perform Such an Analysis.</u>

"The *Erie* line of authorities holds that substantive state law must be applied in federal courts in diversity cases, but state procedural law yields to the applicable Federal Rules." *Klocke,* 936 F.3d at 245 citing *Hanna v. Plumer,* 380 U.S. 460, 465, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) see *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When performing an *Erie* analysis, the Court undertakes a multi-step inquiry. *Hanna*, 380 U.S. at 461–62.

The first step is to determine if the statute at issue is procedural or substantive, as state procedural statutes may <u>not</u> be applied in federal courts. *Erie,* 304 U.S. at

---

[1] *See, e.g. Klocke v. Watson*, 936 F.3d 240*; Carbone.*, 910 F.3d at 1356; *La Liberte v. Reid*, 966 F.3d 79, 85–86 (2d Cir. 2020); *Tah v. Glob. Witness Publishing, Inc.*, 991 F.3d 231, 238 (D.C. Cir. 2021) (explaining that even if the non-movant's "likelihood of success" standard under the D.C. anti-SLAPP statute "mirrors the standards imposed by Federal Rule 56" the law imposes additional procedural burdens and cannot be applied).

78. If procedural, the inquiry is over. State substantive rules must be applied, but before doing so, the Court must decide whether the state substantive law conflicts with federal procedural rules. *All Plaintiffs v. All Defendants,* 645 F.3d 329, 333 (5th Cir. 2011). If a conflict exists, then the federal rule is applied over the state law.

In *Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 181 (5th Cir. 2009) – the case primarily relied upon by Appellant – this Court addressed the applicability of Article 971 through a single sentence: "Louisiana law, including the nominally procedural Article 971, governs this diversity case." Following this proposition of law, this Court cited to *Erie*, a case referencing an "*Erie* guess" based upon Mississippi law; and two Ninth Circuit cases regarding the applicability of California's anti-SLAPP statute and role in federal courts.[2] Notably, *Henry* did not expand upon why Article 971 was characterized as "nominally procedural," nor did the Court reach the issue of whether Article 971 –if substantive – required application of a procedure that could conflict with any of the Federal Rules. In *Henry*, this Court *did* expand upon the "probability of success" standard in Article 971A(1), clarifying that it exceeded the standard for a motion to dismiss under Federal Rule 12 and required a prima facie showing of facts sufficient to sustain a

---

[2] *Henry* cited to *Erie*, [304 U.S. at 78], *Welborn v. State Farm Mut. Auto. Ins. Co.*, 480 F.3d 685, 687 (5th Cir. 2007), and *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972-73 (9th Cir. 1999) (holding the California anti-SLAPP statute could be applied in federal court), and *Thomas v. Fry's Elecs.*, Inc., 400 F.3d 1206, 1207 (9th Cir. 2005) (per curium), (described by the *Henry* court described as "reaffirming" *Newsham*).

favorable judgment."[3]

The year <u>after</u> *Henry*, the Supreme Court decided *Shady Grove*, which examined the issue of when and how a state procedural rule can conflict with a federal procedural rule. 559 U.S. 393 (2010). There, the Court held that a state cannot structure one part of a statute to track a Federal Rule (there, Rule 23) and enact another part that imposes requirements above and beyond the Federal Rule.[4] *Shady Grove* confirmed that where a Federal Rule **answers the same question** as a state law (even an allegedly substantive one), the state law cannot apply if it produces additional hurdles not contemplated by the Federal Rule.

Subsequently, several Circuit courts relied upon *Shady Grove*'s analysis to conclude that anti-SLAPP statutes could not be applied in diversity actions in federal courts, including *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1334 (D.C.Cir. 2015). In *Abbas*, the D.C. Circuit found that, under Justice Scalia's opinion in *Shady Grove*, "[a] federal court exercising diversity jurisdiction should not apply a state law or rule if (1) a Federal Rule of Civil Procedure 'answer[s] the same question' as the state law or rule and (2) the Federal Rule does not violate the Rules Enabling Act." *Abbas*, 783 F.3d at 1333 citing *Shady Grove*, 559 U.S. at 398-99. The *Abbas* court concluded that D.C.'s anti-SLAPP statute,– which, like Article

---

[3] *Henry,* 566 F.3d at 181 citing *Estiverne v. Times-Picayune, L.L.C.*, 950 So.2d 858, 860 (La.App. 4th Cir. 2006) .

[4] *Id.*, 559 U.S. at 401, 130 S.Ct. at 1439.

971 imposes a stay of discovery and requires that the non-movant bear the burden of initially demonstrating the likelihood (or probability) of success on the merits – *answered the same question* as and was at odds with the standards employed under Federal Rules 12 and 56 "by setting up an additional hurdle a plaintiff must jump over to get to trial." *Id.* at 1334. Several other courts followed suit, often citing *Abbas* alongside *Shady Grove* for support.[5]

As indicated above and discussed at length in Sahs' briefing to the District Court, after *Shady Grove* but prior to this Court's decision in *Klocke*, the Fifth Circuit was faced with several cases where the applicability of anti-SLAPP statutes in federal courts was referenced, but not actually decided. *Block II*, 867 F.3d 585, 589, n. 2 (5th Cir. 2017) (collecting six post-*Henry* cases standing for the proposition that the applicability of anti-SLAPP statutes in federal court is an "important," "unresolved," and "open" issue.)

In *Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019) this Court directly and

---

[5] See also *Carbone v.*, 910 F.3d at 1356 (finding pursuant to *Shady Grove*, Georgia's anti-SLAPP law was inapplicable because it answered the same question as Rules 12 and 56 and those rules were "sufficiently broad to control the issue before the court thereby leaving no room for the operation of the motion to strike procedure" citing to *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4–5, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987) ); *Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1048 (N.D. Ill. 2013), aff'd, 791 F.3d 729 (7th Cir. 2015) (finding Illinois anti-SLAPP law, which requires "Section 525 conflicts with Rule 12(d) and Rule 56 by restricting a plaintiff's 'procedural right to maintain [an action]' established by the federal rules and therefore cannot be applied by a federal court sitting in diversity.") *See also Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1188 (9th Cir. 2013) (Watford, J., dissenting from denial of rehearing en banc) (disagreeing with majority decisions regarding California's anti-SLAPP statute and stating "[v]iewed through *Shady Grove*'s lens, California's anti-SLAPP statute conflicts with Federal Rules 12 and 56.")

12

comprehensively addressed the critical issue of whether, or to what extent, a state's anti-SLAPP statute – the Texas Citizens Participation Act ("TCPA") – should be applied by a federal court sitting in diversity. *Klocke* cited *Shady Grove* <u>as controlling Supreme Court precedent</u> for establishing that "a state rule conflicts with a federal procedural rule when it imposes additional procedural requirements not found in the federal rules."[6] *Klocke*, 936 F.3d at 245. This Court also relied expressly on the two-part test set out in *Abbas* for determining whether a state rule, whether "substantive" or "procedural" can be applied in federal courts, and stated "[w]e find most persuasive [the *Abbas* court's reasoning that] Rules 12 and 56, which govern dismissal and summary judgment motions, respectively, answer the same question as the anti-SLAPP statute: what are the circumstances under which a court must dismiss a case before trial?" *Klocke* at 245.

Other notable aspects of this Court's decision in *Klocke* included (1) the adoption of the dissent's reasoning in *Cuba v. Pylant*, 814 F.3d 701, 719 (5th Cir. 2016) (Graves, J. dissent); *Klocke* at 244 (2) the rejection of the categorization of the TCPA (and California's anti-SLAPP statute) as "substantive" laws, *Klocke* at 247, and (3) the rejection of the reasoning employed by the First Circuit in *Godin v.*

---

[6] *Shady Grove*, as "an intervening change in the law . . . [by] the Supreme Court" since *Henry*, provides this Court with a basis pursuant to the Fifth Circuit rule of orderliness, to modify or overturn *Henry* in light of *Shady Grove*. See *Jacobs v. National Drug Intelligence Center*, 548 F.3d 375 (5th Cir. 2008) (reflecting intervening law through Supreme Court decision allows one panel to overturn another panel's decision.)

*Schenks*, 629 F.3d 79 (1ˢᵗ Cir. 2010) to justify applying an anti-SLAPP procedural framework in federal court,[7] *Klocke* at 246-247. Further, while this Court did not overturn *Henry*, it highlighted that the "*Henry* panel did not have the benefit of the *Supreme Court's compelling decision* in *Shady Grove*," as well as the fact that, in *Henry,* it was neither argued nor decided whether there was a conflict between Article 971 and the Federal Rules. *Klocke*, 936 F.3d at 248-249.

Since *Klocke*, this Circuit has not issued any decisions revisiting the applicability of Article 971 in diversity actions in federal court. However, other courts have continued to address the issue, including the Second Circuit in *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020), which sided with the (robust) minority of Ninth Circuit judges who have found that, despite the Circuit's long-held official position, California's anti-SLAPP statute should not be applied in federal courts because of the collision between the Rules and the state statute, which preclude the procedural mechanisms from "co-existing." *See Id.* at 94, n. 4 (indicating "We disagree [that the federal rules and anti-SLAPP statute can exist without conflict]-- as do a number of Ninth Circuit judges" and citing dissenting opinions from Ninth

---

[7] The majority of other Circuit Courts have rejected the reasoning employed in *Godin* to justify application of Maine's anti-SLAPP statute despite Federal Rules 12 and 56. *See, e.g. Abbas* at 1335 (rejecting Godin's analysis); *Intercon Sols*, 969 F.Supp.2d at 1052 (same); *Carbone v*, 910 F.3d at 1356 (11th Cir. 2018) (same). Further of note, as highlighted in *Intercon* [at 1050], the First Circuit's decision in *Godin* relies upon Justice Stevens concurrence in *Shady Grove*, not the majority opinion, which was what was followed by this Court in *Klocke*, 936 F.3d at 244-24.

Circuit reflecting that *Shady Grove* should have changed the court's position.)[8]

Finally of note is the D.C. Circuit's 2021 decision in *Tah v. Glob. Witness Publishing, Inc.*, 991 F.3d 231, 238 (D.C.Cir. 2021). In *Tah*, the Circuit Court addressed whether the D.C. anti-SLAPP statute could be applied in federal courts since, post-*Abbas*, it had been clarified that the non-movant's burden "mirrored" that used in Rule 56 – essentially, what this Court concluded with regard to Article 971 in *Lozovvy*. The *Tah* court held that the clarification did not abrogate *Abbas* because even if the non-movant standard was akin to that imposed under Rule 56, the anti-SLAPP motion to strike was still fundamentally different from summary judgment in two respects. First, *Tah* explained, the D.C. Anti-SLAPP "imposes the burden on plaintiffs" because "even a 'movant' defendant on a Federal Rule 56 summary judgment motion retains some initial 'burden of showing that there is no genuine issue of fact.'" *Id.* at 239.[9] The second way the *Tah* court found an ongoing

---

[8] As further discussed in Sahs' briefing to the District Court (See ROA.1072-1073, 1093-1094), while the Ninth Circuit maintains the position that the California anti-SLAPP can apply in federal courts, it is only through a series of opinions fundamentally re-writing the statute that it can justify the conclusion that *Shady Grove* does not change its analysis. *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833-35 (9th Cir.), amended, 897 F.3d 1224 (9th Cir. 2018) (judicially creating new scheme for analysis of motions under California's anti-SLAPP that, in some cases, removes the requirement for a plaintiff to produce prima facie support for their claims, which is still required under every interpretation of Article 971); *CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1143 (9th Cir. 2022) (finding no conflict exists because of special standards set out in *Planned Parenthood*, 890 F.3d at 834 and using this as an excuse as to why the Supreme Court's decision in *Shady Grove* did not change its analysis.)

[9] This also mirrors the reasoning employed in Judge Graves dissent in *Cuba v. Pylant*, which the District Court here found persuasive. (See ROA.1114-1115.)

conflict with Rule 56 under the D.C. anti-SLAPP was that "unlike a summary judgment motion, a special motion to dismiss will usually be decided 'before discovery is completed.' […] By contrast, under Federal Rule 56, summary judgment is typically 'premature unless all parties have had a full opportunity to conduct discovery.'"[10] The court ultimately concluded 'the bottom line remains: the federal rules and the anti-SLAPP law 'answer the same question about the circumstances under which a court must dismiss a case before trial ... differently,' and the anti-SLAPP law still 'conflicts with the Federal Rules by setting up an additional hurdle a plaintiff must jump over to get to trial.'" *Id.* at 239 citing *Abbas*, 783 F.3d at 1333-34.

This Court has not, to date, analyzed the applicability of Article 971 in federal court in light of *Shady Grove*, nor has it *analyzed* whether Article 971 is procedural or substantive under *Erie*. *See Henry*, 566 F.3d at 181 (assuming without analysis that Article 971 is only "nominally" procedural based upon California decisions and a factually dissimilar case.) When these analyses are undertaken, it is clear that Article 971 cannot apply in federal court, just as the District Court found.

### 1. *Article 971 is a Procedural Article.*

Article 971 is a procedural article rather than a substantive law and, thus,

---

[10] Like, Article 971, the D.C. anti-SLAPP stays discovery immediately but allows – but does not require – the court to authorize "specified discovery" when sought by motion. *Id.*; D.C. Code § 16-5502(B).

should not be applied under the *Erie* doctrine by federal courts on that basis alone. *Lee v. Pennington,* 830 So. 2d 1037, 1041 (La. Ct. App. 2002), *writ denied*, 836 So.2d 52 (La. 2003) ("Article 971 was enacted by the legislature as a ***procedural device*** […]") This procedural status is emphasized by its placement in the Louisiana *Code of Civil Procedure*, as well as the (1) burden-shifting framework in subsection A(1), (2) the provision governing an automatic discovery stay upon the filing of a notice of an Article 971 motion [Art. 971D], (3) specific time constraints for filing (Art. 971C(1)]) and holding hearings on motions to strike [Art. 971C(3)]), and (4) the mandatory award of attorneys' fees if a claim is dismissed ([Art. 971B]).

Article 971, like the TCPA or California's anti-SLAPP statute, creates no substantive rule of state law. See, e.g. *Cuba* at 719; *Makaeff*, 715 F.3d at 273 (Kozinski, C.J., concurring). Article 971 as a pure procedural article is supported by this Court's decision in *Klocke,* which identifies the basis for classifying a statute in this Court as procedural versus substantive and <u>post-dates</u> *Henry,* and provides a valid basis to conclude Article 971 is a procedural mechanism for vindicating existing rights that should <u>not</u> be applied in federal courts under the *Erie* doctrine.

> ### 2. *Because Article 971 Answers the Same Question as Rules 12 and 56, Even if Article 971 is Substantive, It Cannot Be Applied.*

Even if Article 971 is assumed not to be procedural, it cannot be applied by federal courts because it conflicts with the Federal Rules pursuant to the test set forth

in *Klocke*. *Cuba v. Pylant*, 814 F.3d at 719-720. Pursuant to the majority opinion in *Shady Grove*, a federal court exercising diversity jurisdiction should not apply a state law or rule if "(1) a Federal Rule of Civil Procedure 'answer[s] the same question' as the state law or rule and (2) the Federal Rule does not violate the Rules Enabling Act." *Klocke*, 936 F. 3d at 244-245 citing *Abbas*, 783 F.3d at 1333 (quoting *Shady Grove,* 559 U.S. at 398–99.) This Court has already held that Rules 12 and 56 represent a valid exercise of Congress' rule-making authority.[11] Thus, the applicability of Article 971 turns on whether the Rules answer the same question as Article 971 and whether there is a conflict with the Rules due to the imposition of additional procedural burdens under *Shady Grove*. The answer to both questions is "yes."

Rules 12 and 56 answer the same question as Article 971, namely: "what are the circumstances under which a court must dismiss a case before trial?" See *Klocke*, 936 F. 3d at 245 citing *Abbas*, 783 F.3d at 1333–34. Further, Article 971 conflicts with the Federal Rules because Article 971 imposes additional procedural requirements not found in the Federal Rules at each pretrial stage: pleading stage (Rule 12) and summary judgment (Rule 56). *Id.* Thus, Article 971, like the TCPA in *Klocke* or D.C. Code § 16-5502 in *Abbas* and *Tah*, cannot be applied by federal

---

[11] *Klocke* at 248 (finding Rules 12 and 56 "represent such a valid exercise" of Congress's rulemaking authority.)

courts.

> i.   *Rule 12 Answers the Same Question as Article 971, and Article 971 Conflicts with Rule 12.*

Under Rule 12, a federal court may only grant a motion to dismiss if, accepting all well-pleaded factual allegations in a complaint as true, the complaint does not state a *plausible* claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678– 79, 129 S. Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009); *Lexington Ins. Co. v. S.H.R.M. Catering Servs., Inc.,* 567 F.3d 183, 184 (5th Cir. 2009) (To survive a Rule 12(b)(6) motion, a "'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is *plausible* on its face.'"). As emphasized by this Court in *Klocke*, "[a]sking for *plausible* grounds... ***does not impose a probability requirement*** at the pleading stage ...." and it requires no *evidentiary* support. *Klocke*, 936 F.2d at 240 quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Rule 12(b)(6) motions are intended to be decided on the allegations in the complaint alone and assess the sufficiency of a claim prior to discovery.

In contrast, a motion under Article 971, on its face, requires a court to determine whether "the plaintiff has established a *probability of success on the claim*" and mandates the consideration of content outside the complaint – namely supporting and opposing affidavits stating the facts upon which the liability or defense is based." (Emphasis added.) Article. 971A(1)&(2). As succinctly stated by the District Court, which relied, in part, on Judge Graves' dissent in *Cuba*, "Article

971 conflicts with Rule 12 by allowing a court to consider and weigh evidence rather than assuming the allegations in the complaint are true." (ROA.1115-1116.) Indeed, the consideration of external evidence is mandatory, not merely permissible – something not contemplated by Rule 12. Article 971(A)(2)) (requiring that the court "shall" consider external evidence.) Furthermore, in opposing an Article 971 motion, "plaintiff must produce *evidence* of sufficient quality and quantity to demonstrate that he will be able to meet his burden of proof at trial." *Henry,* 566 F.3d at 181 citing *Estiverne*, 950 So.2d at 860. Were the foregoing somehow insufficient to establish that Article 971 facially conflicts with Rule 12, this Court's decision in *Henry* removes any ambiguity by clearly stating that, under Article 971, the non-movant's burden "***requires more than that which is necessary to survive a normal motion to dismiss***" under Rule 12(b)(6)). (Emphasis added.) *Id.*

Thus, under *Shady Grove* and this Court's interpretation of the same in *Klocke*, Article 971 clearly conflicts with Rule 12(b)(6). The conflict between Article 971 and Rule 12(b)(6) renders Article 971 inapplicable in federal court sitting in diversity.

> ii. *Rule 56 Answers the Same Question as Article 971, and Article 971 Conflicts with Rule 56.*

While Federal Rule 56 answers the same question as Article 971 about the circumstances under which a court must dismiss a case before trial, Rule 56 does it differently than Article 971. Rule 56 does not require a non-movant to establish "a

probability of success on the claim" – or establish a prima facie case on all elements from the outset.  And that difference matters because a plaintiff who meets Rule 56 (as well as Rule 12) standards for overcoming a motion for summary judgment (or to dismiss) is <u>entitled to a trial</u>. Thus, Article 971 nullifies a right and path to trial that universally is available to all federal litigants, and it conflicts with the Federal Rules granting and limiting that path "by setting up additional [state law] hurdle[s] a plaintiff must jump over to get to trial in federal court." *Abbas*, 783 F.3d at 1334. In the instant case, "an additional hurdle. . . plaintiff [Sahs] must jump over to get to trial" requires Sahs to establish "a probability of success on the claim" at least by a preponderance of evidence (Art. 971A(1)) and by "clear and convincing evidence" for proving actual malice.

Federal Rule 56 states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Under Rule 56(c), even when the non-movant bears the burden of proof at trial, "[s]imply filing a summary judgment motion does not immediately compel the party opposing the motion to come forward with evidence demonstrating material issues of fact as to every element of its case." (emphasis added) *Russ v. International Paper Co.,* 943 F.2d 589, 591 (5th Cir.1991). The party opposing summary judgment succeeds by showing that a material fact issue exists and requires trial by a factfinder, which is

the jury in the instant case before this Court. In ruling on a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter [asserted] but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Article 971's burden-shifting framework imposes additional requirements and burdens on a plaintiff, which extend well beyond those found in Federal Rule 56 (as well as Federal Rule 12), and diminishes the burden for defendants to seek the requisite relief.

Notably, Article 971 does not require the defendant to proffer reasons why plaintiff's claims should be dismissed. The defendant does not have to furnish any **evidentiary showing of any kind** to shift the burden of proof to the plaintiff; rather, all the defendant must show is the cause of action arises "from an act of that [defendant] in furtherance of the [defendant's] right of petition or free speech . . . in connection with a public issue[.]" See Article 971A(1); *Henry*, 566 F.3d at 181. Federal Rule 56, however, places the initial burden on the moving party and then shifts the burden to the nonmoving party to show that there is a dispute that merits trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Under both the federal summary judgment procedure, the defendant's *initial* burden is far more substantial, requiring an evidentiary showing of a lack of *prima*

*facie* proof for at least one element of the plaintiff's claim. Fed. R. Civ. P. 56. Article 971, however, relieves defendants of their initial Rule 56 burden, which is clearly a "distinct purpose" for enactment of Article 971.[12] Further, Article 971 requires <u>more than</u> a determination that there are no disputed facts that would allow the court to decide the claims as a matter of law or even the mere evidence of some evidence to establish such a fact issue. It requires that a plaintiff pursuant to Article 971 must submit a *prima facie* showing facts sufficient to sustain a *favorable judgment*, which requires **more than** that which is necessary to survive a normal motion to dismiss pursuant to Rule 56. Thus, Article 971 forces a plaintiff, in essence, to submit affidavits stating ***all*** the facts upon which the defendant's liability is based, a task much more onerous and greater than for a summary procedure which requires only addressing whether there are any issues of facts in dispute and not having to detail all the facts upon which defendant's liability is based**.[13]**

Furthermore, all discovery is immediately stayed "upon the filing of a notice

---

[12] The District Court in *Lozovyy*, after examining the legislature's intent in enacting Article 971, stated: "there must be a distinct purpose for an article 971 Motion to Strike; otherwise there would be no point in enacting the statute because the Legislature could have merely relied on the <u>summary judgment article</u> itself." *Lozovyy v. Kurtz,* No. 3:13–CV–00424, 2015 WL 331804, at *12 (M.D.La. Jan. 26, 2015). Had it been the intent of the Louisiana legislature to employ a summary judgment standard under Article 971, the Louisiana legislature would have done so.

[13] "Generally, summary judgment is disfavored when <u>issues of intent or state of mind</u> are involved because those determinations are inherently a question of fact which turns on credibility." *Ross v. Dejarnetti,* Civil Action 18-11277 (E.D. La. Jul. 30, 2021), citing *Int'lShortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265-66, n.13 (5th Cir. 1991).

of motion made pursuant to [article 971]" and the court makes its determination considering only "the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." Article 971A(2). This stay *can* be altered to permit "specified discovery" for "good cause" on "noticed motion," but requires the plaintiff shoulders the burden of seeking this relief and the court is not required to grant it. [14] As such, the presumption is that the motion will be decided without any discovery being conducted – the inverse of what's contemplated under Rule 56.

These two fundamental differences between Rule 56 and Article 971 – i.e. the placement of the initial burden on the plaintiff to demonstrate a prima facie case on the merits and the lack of an entitlement to discovery – have been found sufficient "hurdles" to bar the application of an anti-SLAPP statute in federal court. *See Tah*, 991 F.3d at 239.

Article 971 indubitably imposes burdens and hurdles not contemplated by Federal Rules 12 or 56 - Rules which answer the same question about the circumstances under which a court must dismiss a case before trial but in a different

---

[14] *See Roper v. Loupe*, 2015-1956 La.App. 1 Cir. 10/28/16 (La.App.) (specifically stating in the context of an Article 971D request for discovery is discretionary.) Significantly, as alluded to supra, the Ninth Circuit has recognized the problematic nature of a discovery stay and/or filing of, in essence, a motion for summary judgment prior to conducting any discovery whatsoever. *Planned Parenthood*, 890 F.3d at 833–34 (holding that to the extent that an anti-SLAPP motion challenges the factual sufficiency of a claim then a Rule 56 standard is applicable and discovery *must* be allowed.)

24

fashion. Article 971 should not be applied in federal court as it "directly collides" with Federal Rule of Civil Procedure 56, as well as by Federal Rule 12. *See, e.g., Abbas*, 783 F.3d 1328, 1337 (citing *Shady Grove*, 559 U.S. at 398–99; *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14, 61 S. Ct. 422, 426, 85 L. Ed. 479 (1941))..

**II.  Even if Article 971 Were Applicable, Loyola's Motion Would Fail on the Merits.**

Assuming arguendo that the District Court erred in finding Article 971 does not apply in federal courts, this matter should be remanded to the District Court for a ruling on the merits of Loyola's Motion to Strike.[15] However, were this Court to undertake its own merits-based decision on Loyola's motion, it will ultimately yield the same result – a denial of the motion and Sahs' ability to move forward with his case.

A.  <u>The Standard for Denying an Article 971 Motion to Strike.</u>

Critically, Article 971 requires denial of a Motion to Strike if the plaintiff demonstrates that *any* claim set forth in the Complaint can survive the two-pronged

---

[15] *Godin*, 629 F.3d at 92 (1st Cir. 2010) ("We reverse the district court's order, and remand so that the district court may consider the merits of the individual defendants' special motion to dismiss under [Maine's anti-SLAPP statute] in the first instance.") The procedural history of *Godin* indicates that the parties did engage in anti-SLAPP briefing on the merits, but that the court solely decided – as here – based upon the issue of the anti-SLAPP statute's applicability. *See, Godin v. School Union 134*, 2009 WL 1686910, *5, n. 4 (D.Me. June 16, 2009) (referencing arguments made on the merits.)

It is further of note that, here, the District Court's ruling on Loyola's Motion to Stay suggests it has contemplated the merits of the Motion to Strike when, for example, it ruled that certain claims asserted by Plaintiff did not even implicate an Article 971 analysis. (Jt. Stip. to Supp. Record (App. Doc. 47) to include District Court Doc. No. 74.)

procedural hurdles imposed by the Louisiana state legislature. As highlighted in briefing to the District Court, "[i]n cases where more than one claim is alleged in the petition and a special motion to strike is filed, the courts examine the probability of success of each claim individually; if a plaintiff can demonstrate a probability of success on *any* of her claims, *then the special motion to strike must fail*." (Emphasis added.) *Frigon v. Universal Pictures, Inc.* 2017-0993 p. 17 (La. 6/21/18), 255 So.3d 591, 602.

Further, pursuant to established precedent, Article 971A's "'probability of success' standard does not permit courts to weigh evidence, assess credibility, or resolve disputed issues of material fact." *Lozovyy*, 813 F.3d at 586, and *Block I*, 815 F.3d at 221. Thus, when issues arise which are for the trier of fact (e.g., assess credibility or resolve disputed issues of material fact), the motion should be denied and left to the trier of fact. Here, Sahs presented more than sufficient evidence through briefing to the District Court to demonstrate the existence of factual issues for the jury on more than one claim and, in the case of several claims, that Loyola has not met its initial burden.

B.     Sahs has a Viable Claim in Defamation Related to the Second Article.

Sahs initially addresses his defamation causes of action related to the March 2, 2023 Second Libel Article and Picture ("Second Article") (ROA.442), which was authored by journalism Prof. Michael Giusti ("Prof. Giusti") and is still published

on the Internet as of July 29, 2025 at:

https://loyolamaroon.com/10037952/news/campus/loyola-student-arrested-

in-dining-hall/

This Second Article has been on the Internet for **more than 2 years**. (ROA.1208-

1209.) The First Article (ROA.431**)** was removed from the internet on or about

March 17, 2023 after Sahs's attorney sent a March 10, 2023 cease and desist letter

(ROA.441-442**)** to the President of Loyola which identified the defamatory,

malicious, and false statements therein and demanded that the statements be

immediately removed from the Internet.

To succeed on a claim for defamation, "a plaintiff must necessarily prove four

elements: (1) a false and defamatory statement concerning another; (2) an

unprivileged publication to a third party; (3) a fault (negligence or greater) on the

part of the publisher; and (4) resulting injury." *Fitzgerald v. Tucker*, 98–2313, p. 10

(La. 6/29/99), 737 So.2d 706, 715. "A statement is defamatory if it tends to harm the

reputation of another so as to lower the person in the estimation of the community,

deter others from associating or dealing with the person, or otherwise expose the

person to contempt or ridicule." *Kennedy v. Sheriff of East Baton Rouge*, 2005–1418

p. 4 (La.7/10/06), 935 So.2d 669. These standards embrace claims sounding as

slander or libel. See *Hogan v. Williams*, 18-620 (La. App. 5 Cir. 5/23/19), 274 So.

3d 762, 768. "Words which expressly or implicitly accuse another of criminal

conduct, or which by their very nature tend to injure one's personal or professional reputation, even without considering extrinsic facts or surrounding circumstances, are considered defamatory per se." *Kosmitis v. Bailey*, 28,585, p.4 (La.App. 2 Cir. 12/20/96), 685 So.2d 1177, 1180. When defamation per se is proven, malice is presumed. *Id.* at 28,585, at 4, 685 So.2d at 1180. "When words are not defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, the elements of falsity, malice (or fault) and injury." *Id*.

Actual malice must be proved with "clear and convincing evidence" that the alleged defamatory statements were made with knowing and reckless falsity." *Tarpley v. Colfax Chronicle*, 94-2919 (La. 2/17/95), 650 So. 2d 738, 740. The issue of actual malice focuses on a defendant's state of mind.[16] See *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th. Cir. 1987) *citing Hoffman v. Washington Post. Co.*, 433 F. Supp 600, 605 (D.C. 1977)).

In his Affidavit, Prof. Giusti claims that he reviewed and approved a draft of the March 2, 2023 First Article (ROA.431) and did not find anything "improper" about publishing the article "on the night of March 2, 2023" because it "accurately reported information received directly from the Loyola University Police

---

[16] It bears mention again that the "hurdles" or requirements under Article 971 – that are not present under Rule 56 – are particularly pronounced given the actual malice standard, which focuses on "**Prof. Giusti's state of mind**" and is subject to a clear and convincing standard operates without pre-decisional discovery.

Department ("LUPD"). (ROA.844-845.)[17]  Prof. Giusti, notably, does not identify the source of the "information" to which he refers, nor indicate whether he personally reviewed the source(s) of the information – a seemingly foundational requirement to allow him to attest to the "fact" that the First Article was "accurately reporting" on information from LUPD.

Prof. Giusti also states in his Affidavit that on March 16, 2023, he was given permission from Loyola to repost an amended version of the March 2, 2023 article ("Second Article"), which *he alone* drafted. (ROA.845.)  Prof. Giusti states that a true and correct copy of the Second Article is attached to Plaintiff's First Amended Complaint.  (ROA.845.)  Prof. Giusti's Second Article replaced the following defamatory statements from the First Article:

(a) "Loyola police said Sahs was in possession of chemical materials that can be used to kill people."
(b) "LUPD said they believe he will be brought up on terroristic threat charges as well."
(c) "LUPD said Sahs made social media posts regarding the student who completed the report, spreading personal information regarding them such as the individual's nationality and family."

with the defamatory statement: "The **affidavit** claimed Sahs was in possession of chemical materials that can be used to kill people." (Emphasis added.)

This *exacerbates and sensationalizes* the defamatory statement "Sahs was in

---

[17] Sahs notes that Prof. Giusti's statement is in conflict with the Code of Ethics for *The Maroon* – which, though no longer publicly accessible through the link on the publication's website, was archived as recently as **April 13, 2024**. (ROA.1013.)

possession of chemical materials that can be used to kill people" because **a sworn affidavit, which is signed by a Magistrate Judge, is probable cause for an arrest**. In other words, Loyola was now (and <u>still is</u>) disseminating to the public false and defamatory information that there was (and <u>still is</u>) *probable cause to arrest Sahs* for being in **possession** of chemical materials that can be used to kill people. Significantly, when the Second Article was published by Loyola, it was deceptively back-dated to reflect a date of publication of March 2, 2023. Yet, on March 2, 2023, the police <u>Narrative Report never existed</u>, only the Affidavit for Arrest Warrant existed.[18] The "Affidavit for Arrest Warrant" does not state that "Sahs was in **possession** of chemical materials that can be used to kill people." (ROA. 988.)

> Prof. Giusti states in his affidavit:
>
> Before drafting the Amended Article, I **reviewed** New Orleans Police Department ("NOPD") Officer Christopher Coleman's Affidavit for Arrest Warrant of Luke Sahs and the New Orleans Police Department Incident Report C-01688 ("Incident Report"), which included Officer Coleman's Narrative description of the criminal complaint submitted by Loyola Student Morgan Matteson against Luke Sahs, both of which are attached to Plaintiff's First Amended Complaint as Exhibit IV.

(ROA.845.) As a professor of journalism, Prof. Giusti surely understood what he read in the "Affidavit for Arrest Warrant," and **<u>knew</u>** that the slanderous statement

*"[t]he affidavit claimed Sahs was in possession of chemical materials that can be*

---

[18] The salient part of the "Affidavit for Arrest Warrant" is stated in the First Amended Complaint (ROA.421-442) and was included in the briefing in the District Court (ROA.988) <u>without</u> Morgan Matteson's name being redacted.

*used to kill people"* in the Second Article was and is false. (ROA.421-422, 443.)

*See*, *Kennedy*, 935 So.2d at 683-86; *Trentacosta v. Beck*, 96-2388 (La. 10/21/97), 703 So.2d 552, 563-64 and n.16 (actual malice includes making false statements with <u>knowing falsity</u> or with reckless disregard for their truth).

    Paragraph 12 of Prof. Giusti's affidavit states:

> After reviewing Plaintiff's First Amended Complaint in this case, I realize that my Amended Article contains one mistake in terminology, where I referred to Officer Coleman's "Affidavit," instead of referring to Officer Coleman's "[Narrative] Report" in the following statement: "The affidavit claimed Sahs was in possession of chemical materials that can be used to kill people."

(ROA.845-846.)

    Prof. Giusti, through his Affidavit, has changed the word "affidavit" in the defamatory statement "[t]he **affidavit** claimed Sahs was in possession of chemical materials that can be used to kill people" to the word **"[Narrative] Report**," such that the defamatory statement in the Second Article now reads: "[t]he **Narrative Report** claimed Sahs was in possession of chemical materials that can be used to kill people." (Emphasis added.) In other words, he has now changed the <u>identification</u> of the document where the defamatory statement appears.

    Most notably, by Prof. Giusti changing through his Affidavit the word "affidavit" in the defamatory statement, "[t]he **affidavit** claimed Sahs was in possession of chemical materials that can be used to kill people" to the word **"[Narrative] Report**," such that the Second Article now reads "[t]he Narrative

Report claimed Sahs was in **possession** of chemical materials that can be used to kill people," Prof. Giusti has submitted a false statement to this Court— **one made in a sworn Affidavit.** (ROA.915-916.)

In its Brief to this Court, Loyola affirms Prof. Giusti's false representations by stating:

> In the amended *Maroon* article, Giusti does mistakenly state that "[NOPD Officer Coleman's] affidavit claimed Sahs was in possession of chemical materials," whereas **Officer Coleman's Incident Report, not his Affidavit, contained those allegations**. (ROA. 745, 915-916.)

Officer Coleman's Incident/Narrative Report does not say, nor suggest, that "Sahs was in **possession** of chemical materials that can be used to kill people" – a crime. (ROA.989.) A true and correct copy of the Incident Report by NOPD Officer Coleman (ROA.988) is clearly marked: "LAW ENFORCEMENT USE ONLY," and is **not to be used for any other purpose**.[19] (ROA.989.) Officer Coleman's Report states in part:

> "Mr. Sahs also made multiple statements that he **knew how** to build both bombs and chemical warfare devices. Mr. Sahs went into detail describing **how he could** combine white phosphorus and pure zinc to create a deadly chemical. Mr. Sahs made comments that **he could use** a chemical agent in his on campus dormitory vents to kill everyone in the building."

(Emphasis added) (ROA.988-989.) There is a significant distinction between

---

[19] As explained to the District Court, the stamp LAW ENFORCEMENT USE ONLY, calls into question the use by a surely experienced journalist. Prof. Giusti would know that documents restricted to **LAW ENFORCEMENT USE ONLY** cann*ot be used* by Loyola, especially for disseminating defamatory information.

"**knowing how** to build both bombs and chemical warfare devices" (not a crime as all military-industrial scientists would know how) and being (especially a college student) "in **possession** of chemical materials that can be used to kill people." (a crime)

Finally, Prof. Giusti seeks to be exonerated for his "mistake" by stating in his Affidavit:

> I am not a lawyer, and at the time I reviewed the Court documents attached as Exhibit IV to Plaintiff's First Amended Complaint on March 13, 2023, I believed that the NOPD Incident Report was part of the materials submitted by Officer Coleman in connection with his Affidavit for Arrest Warrant for Luke Sahs. This was a mistake in terminology on my part.

(ROA.846.) It is axiomatic that ignorance of the law is no defense. (see La. Civil Code art. 5 (2023) stating "[n]o one may avail himself of ignorance of the law.") Prof. Giusti had Loyola lawyers immediately available from whom he may have sought consultation and advice, such as the General Counsel for Loyola. (ROA.444.)

Changing the identification of the document from where the defamatory words should have been written at this late stage is an attempt to change the defamatory words, as well as Sahs' defamation claims, especially since there is a major legal distinction between defamatory words in a **sworn affidavit,** which is signed by a Magistrate Judge and ***establishes probable cause for an arrest***, as opposed to the defamatory words written in a confidential police Narrative which is

not a sworn statement and has **<u>each page</u>** stamped "**LAW ENFORCEMENT USE ONLY.**" (Emphasis in original.) This hardly is "one mistake in terminology" as Prof. Giusti swears to in his Affidavit.

As for any good faith intentions Prof. Giusti may have had, good faith is to be determined by the fact finder— the jury in the instant case. In *St. Amant v. Thompson,* the U. S. Supreme Court held that "[t]he finder of fact must determine whether the publication was indeed made in good faith." 390 U.S. 727, 732 (1968). As is pointed out in *St. Amant*, this Court is not required to accept such self-serving statements by Prof. Giusti in light of evidence showing the contrary. The Second Article is a continuous defamatory article and picture still published on the Internet and is continually causing irreparable harm to Sahs's reputation and well-being, leading to lasting negative consequences including significant emotional distress, anxiety, depression, and feelings of shame and humiliation.

    C. <u>Sahs has a Viable Claim in Defamation Related to the March 2, 2023 First Libel Article and Picture</u>

### 1. *The Affidavit of Damon Bell*

In his October 2024 Affidavit Damon Bell ("Bell") states that on March 2, 2023, NOPD briefed him that NOPD had an arrest warrant for Sahs for allegedly stalking another student and had made statements that he had "***the ability to mix*** dangerous chemicals that could be used to harm other people." (Emphasis added.) (ROA.834.) Any preliminary briefing by NOPD with Bell was not because Sahs

was "*in possession of* chemical materials that can be used to kill people." It was because Sahs may have allegedly had "*the ability to mix* dangerous chemicals that could be used to harm other people." (ROA.834.)

In his same October 2024 Affidavit, Bell <u>changed</u> his testimony from Sahs having "*the ability to mix* dangerous chemicals that could be used to harm other people" to Sahs being *in possession of* chemical materials that can be used to kill people. See paragraph 13 of Bell's Affidavit ("I provided the following . . . statements based on information that I had learned from the NOPD . . . that [Sahs] **has chemical material in possession that he can mix, that he can kill people . . .** so I think he's gonna be brought up on some terroristic threats also." (Emphasis added) (ROA. 835); and paragraph 18 ("I believed in <u>good faith</u> that there would be additional charges forthcoming against Luke Sahs based on the information I learned from my briefing with the NOPD, including that Sahs was alleged to have made threats that **he had chemical materials in his possession** that he could mix to cause harm to other people." (Emphasis added) (ROA.836.)

Absent from Bell's testimony, however, is any discussion about **<u>how</u>** he 'learned' this information from the NOPD. Bell is further unable to point to any document which indicates that NOPD ever received a report that Sahs **<u>was in possession</u>** of chemicals, or that there had been any allegations against Sahs for using social media in any inappropriate manner. Finally, Bell is unable to confirm that he

was told by any <u>specific</u> NOPD officer that Sahs would face any charges even closely tangential to charges of terrorism or terroristic threats.

In fact, Bell is unable to testify to these facts because no NOPD officer believed or stated these facts. As demonstrated in the body-cam footage of the NOPD officers involved in the arrest, they did not believe that Sahs was in possession of any chemicals or that Sahs would be charged with any terror related crimes. (ROA.991.) Statements made by NOPD Officer Coleman associated with the arrest of Sahs would reasonably indicate that NOPD <u>never told</u> Bell that Sahs was a suspect for committing any bomb threats, or terrorist threat activities, especially in light of the fact that NOPD Officer Coleman specifically told Sahs at 7:56 p.m. on March 2, 2023 while transporting him to police headquarters: "*I have a warrant for you for* stalking, ***not for bombs***. *If I thought that you committed [sic] a bomb, it would not be NOPD picking you up, it would be somebody else.*" (*Id.*) A charge relating to "terroristic threats" under Louisiana law can result in <u>a fifteen-year prison sentence</u>. (See La. R.S. § 14:40.1 ("Terrorizing; menacing."))

NOPD Officer Coleman <u>knew</u> that Sahs was not a suspect for committing any bomb or terrorist threats and would have no reason or purpose to tell Bell anything differently. Officer Coleman's statement disputes sworn statements made by Bell. Further, Bell was present and knew that NOPD officers entered Sahs's dormitory room and did a cursory search of the room and did not find any dangerous or

suspicious chemicals. (ROA.990.) Finally, Bell was present when Sahs was arrested and knew that no chemicals were found on his person during the arrest. (ROA. 991.)

Notwithstanding the fact that Bell was there for the arrest and search of Sahs, and clearly saw and <u>knew</u> that NOPD officers did not find any chemical materials in Sahs' <u>possession</u> that can be used to kill people, less than 1 -2 hours later, Bell provided the following defamatory and false statements to Witt in his recorded conversation with Witt:

> There was the separation order against this guy [Luke Sahs] for stalking, but in addition to that, he stated to go on social media and talk about things like where his parents are from, his nationality; *he has chemical material in* possession *that he can mix, that he can kill people with and different things like that, so I think he's goanna be brought up on some terroristic threats also.* [Emphasis added.]

> They didn't search his room. We went to the room to locate him, but he wasn't there.

(ROA.835.) At some unknown time after Witt recorded her conversation with Bell and apparently left the station. Thereafter, she prepared an article about Sahs's arrest headlined "Loyola student arrested in dining hall" (the March 2, 2023 First Libel Article and Picture "First Article") and published it the same evening (ROA.431-432). It stated, in part:

> Loyola police said Sahs was in possession of chemical materials that can be used to kill people. LUPD said they believe he will be brought up on terroristic threat charges as well. LUPD said Sahs made social media posts about the student who completed the report, spreading personal information about them such as the individual's nationality and family.

The article repeated the false and inherently damaging statements made by Bell to Witt and included new false statements that do not reflect what "LUPD said." Further, while the article purports to be about the "arrest" – an arrest for "stalking" – the majority of the substantive allegations against Luke concern the unsupported "other" claims that did not relate to the "stalking" charge. More specifically, the article highlights Sahs being in "possession of chemical materials," "terroristic threat[s]" and the dissemination of personal information about Matteson, her family, and her "nationality." (ROA.745).

Witt inexplicably claims in the **First Article** that "LUPD said Sahs made social media posts *about the student who completed the report*, *spreading personal information about them such as the individual's nationality and family*." However, this is not what is stated by Bell in the recording, nor is such an allegation made anywhere but in Witt's article. There is no evidence that Ms. Matteson ever accused Luke of engaging in this conduct. It is a fabrication generated by Loyola alone that advances the false narrative that not only was Luke a "terrorist," but singling out individuals based upon their "nationality." It is a patent falsehood and one that is absurdly outlandish given that Luke did not have any social media accounts at the time. (ROA.982.)

The statements "he [Sahs] has chemical material in possession that he can mix, that he can kill people with and different things like that, so I think he's gonna

be brought up on some terroristic threats also" are ***egregious false statements*** made with "knowledge of falsity" and "reckless disregard for the truth." Thus, there are "obvious reasons to doubt the veracity of [Bell] or the accuracy of his reports." *St. Amant v. Thompson* 390 U.S. 727, 732, n. 3 (1968) citing *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130, 169-170. See also *Trentecosta v. Beck* 703 So. 2d 552, 562 (La. 1997) (citing *St Amant* and holding that "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.) "Recklessness is, in effect, 'gross negligence.'" *Mariana v. Magnolia Auto Transp., LLC*, 21-447 341 So. 3d 1281, 1291 (La. App. 5 Cir. 5/26/22).

## 2. *Bell's Alleged Good Faith*

In his Affidavit Bell swears in part that "[a]t the time I spoke with Ms. Witt and wrote my LUPD report, I believed **in good faith** that there would be additional charges forthcoming against Luke Sahs … including that Sahs . . . had chemical materials in his possession that he could mix to cause harm to other people." (Emphasis added.) (ROA.836.) Bell's self-serving affidavit saying what he did was in "good faith"— which in the instant case is to be decided by the jury —will not cure the false-and defamatory statement defects, as the U. S. Supreme Court stated in *St. Amant*:

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. **The finder of fact must determine whether the publication was indeed made in**

**good faith.**

(Emphasis added.) 390 U.S. at 732.

D. <u>Facts in Dispute for the Jury to Decide</u>

This Court has determined that the "'probability of success' standard does not permit courts to weigh evidence, assess credibility, or resolve disputed issues of material fact." *Lozovyy*, 813 F.3d at 586, and *Block I*, 815 F.3d at 221. Thus, when issues arise which are for the trier of fact (e.g., assess credibility or resolve disputed issues of material fact), this Court should defer the issue to the jury for the resolution. The issues of facts of record for the jury to resolve in the instant case include *inter alia*:

> (a) whether NOPD Officer Coleman, or any other NOPD police officer, told Sgt Bell that Sahs was in possession of chemicals materials that can be used to kill people. (ROA.1082-1083.)
>
> (b) whether Officer Coleman, or any other NOPD police officer, told Sgt Bell that they believe Sahs will be brought up on terroristic threat charges as well. (ROA.1082-1083.)
>
> (c) whether Officer Coleman, or any other NOPD police officer, told Sgt Bell that Sahs made social media posts regarding the student who completed the report, spreading personal information regarding her such as the individual's nationality and family. (ROA.1082-1083.)
>
> (d) whether the "Affidavit for Arrest Warrant" for Sahs was to initially remain "confidential" and not a public record in the evening of March 2, 2023 (ROA.422, 1082-1083.)
>
> (e) whether Sgt. Bell had statutory authority under La. Public Record Laws to discuss Sahs's arrest with anyone at Loyola. (ROA. 422-423, 1082-1083.)

E. Separate Causes of Actions Not Associated with the Motion to Strike Pursuant to Article 971 May Proceed, As Determined by the District Court.

### 1. Causes of Action Not Arising from Acts in Furtherance of the Right of Petition or Free Speech in connection with a Public Issue Cannot be Dismissed under Article 971.

Defendant-Appellant Loyola argues that this Court should dismiss the additional non-defamation causes of actions in the First Amended Complaint ("FAC") (ROA.415-482) because allegedly they "all arise from Loyola's acts in furtherance of its free-speech rights within the scope of Article 971." (App. Doc. 41 p. 44.) The additional non-defamation causes of actions pending in the FAC (ROA.415-482) include *inter alia*: (1) breach of contract; (2) breach of covenant of good faith and fair dealing; (3) negligence; (4) negligent infliction of emotional distress; and (5) vicarious liability, which are all separate and distinct causes which are distinguishable over defamation and freedom of speech. Article 971 applies specifically to causes of action arising from acts in furtherance of the right of petition or free speech in connection with a public issue. The alleged protected speech at issue pertains to Bell's oral statements to Witt and the two *Maroon* articles. None of the additional non-defamation causes of actions aim to stifle the exercise of free speech or petition rights regarding a public issue.

There has been no judgment of any kind from the District Court pertaining to (1) breach of contract; (2) breach of covenant of good faith and fair dealing; (3)

negligence; (4) negligent infliction of emotional distress; and (5) vicarious liability.

Judge Morgan denied Loyola's request to stay discovery (ROA.1120-1121), ruling in her May 23, 2025 Order[20]:

> It would be improper for the Court to further delay discovery. Moreover, Plaintiff [Sahs] has alleged causes of actions in tort and breach of contract that ***do not implicate Article 971***. [ROA.691-701, 1152-1153.] There is no reason to delay discovery because ***these claims will remain even if Loyola's appeal is successful***.

Thus, the tort and breach of contract causes of action ***do not implicate Article 971***.

### 2. *Plaintiff-Appellee Sahs will Prevail on his Claims for Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing.*

Defendant-Appellant Loyola glosses over the allegations in Counts IX and X of Plaintiff-Appellee Sahs's FAC (ROA.415-482) relating to Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing and makes conclusory allegations those claims should be subject to the same analysis as his causes of actions relating to defamation.

Counts IX and X do *not* arise from acts in furtherance of the right of petition or free speech in connection with a public issue, but, rather, challenge the arbitrary nature for which Defendant-Appellant Loyola meted out punishment against Sahs.

---

[20] See Jt. Stip. to Supp. Record (filed contemporaneously with this Brief), seeking inclusion by stipulation District Court Doc. No. 74.

Before the four New Orleans police officers and two Loyola private security employees arrested Sahs on March 2, 2023 for the ***misdemeanor offense*** of allegedly stalking Matteson, the officers had searched Sahs small dormitory room for firearms, and any other dangerous weapons, and did not find anything related to any firearms, or any other dangerous weapons. (ROA.424-425.) When Sahs was arrested and incarcerated shortly thereafter by the NOPD officers and two LUPD employees, no weapons or firearms of any kind were found in Sahs's possession. (ROA.473.)

On March 3, 2025, while Sahs was incarcerated and had no means for communicating with the outside world, Loyola's Director of Student Conduct, Ms. Akilah Jones, e-mailed a *Personal and Confidential* Interim Suspension Notice ("Suspension Notice") to Sahs which Sahs never received since he was in jail. (ROA.434, 436-437.) The Suspension Notice, a personal and confidential document not pertaining to the exercise of free speech or petition regarding a public issue, states that the reason Loyola suspended Sahs was for "the possession of and/or use of firearms or other dangerous weapons," a violation of the Student Code of Conduct. The Suspension Notice summarily and immediately suspended Sahs on March 3, 2023 from his studies at Loyola, stating that Sahs "**will remain on interim suspension until the criminal investigation and university student conduct process are complete**." The criminal investigation ended at the time of Sahs's arrest

on <u>March 2, 2023</u>, and had been long over when on the morning of January 22, 2024, the New Orleans District Attorney dismissed the criminal case against Sahs *for lack of evidence*. (ROA.447.) Sahs was never brought up on any charges relative to the possession of weapons or "chemical materials" that could be used for harmful purposes, as – like the "stalking" charge – there was simply no evidence to substantiate those false allegations. (ROA.447.)

Most relevant is the fact that the Student Code of Conduct specifically states that "[i]nterim actions are not a finding that the student . . . violated the Code" of conduct. (ROA.852-853.) Notwithstanding this agreement between Loyola and Sahs, Loyola unilaterally breached this contract and falsely accused Sahs of being "in possession of and/or use of firearms or other dangerous weapons" in breach of the Code of Conduct, in spite of knowing that Loyola and New Orleans police officers found no firearms, or any other dangerous weapons, when they searched Sahs's dormitory room on March 2, 2023, and that Sahs had no chemical materials or dangerous weapons of any kind in his personal possession at the time of his arrest in the evening of March 2, 2023.

Loyola further breached its agreement with Sahs by never commencing, as promised, any "university student conduct process" pursuant to the Suspension Notice. By not commencing any "university student conduct process," Loyola's actions against Sahs breached its own policies, as well as the guarantees of due

process and fundamental fairness. On March 27, 2023, Sahs sent an email to Loyola inquiring if the university had started its "university student conduct process" pursuant to the Suspension Notice, as the criminal investigation was over. Loyola subsequently informed Sahs that no "university student conduct process" will begin until the New Orleans DA has finished with the case, thus adding additional requirements beyond those stated in the Suspension Notice. Clearly, Loyola had no intention of commencing a "university student conduct process," as agreed to in the Suspension Notice.

Loyola breached and violated a covenant of good faith and fair dealing implied in its contract with Sahs by acting maliciously or arbitrarily by meting out an unjust, malicious suspension and sanction against Sahs, notwithstanding the lack of evidence to support any allegations that Sahs possessed chemical materials or dangerous weapons of any kind which could be used to kill people. (ROA.475-476.)

Because the actions described in Sahs's Complaint and causes of action for Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing do not constitute "protected speech," they cannot be included for consideration in an Article 971 motion. Sahs further states that this same analysis applies to his claims for negligence (ROA.466-469), negligent infliction of emotional distress (ROA.470), and Vicarious Liability (ROA.471.)

### 3. *Sahs Has Met His Burden on His Negligence-Based Claims.*

#### i. *Sahs Will Prevail on His Claim for Negligence.*

Loyola fails to provide any argument that Sahs cannot make his claim for negligence beyond stating that the negligence claim is a regurgitation and resuscitation of his claims in defamation. A review of Sahs's Complaint shows, however, that this assertion is baseless and Sahs has stated a prima facie case for negligence.

While Sahs does allege that Loyola was negligent in the publication of false and defamatory statements without verifying the truth or falsity of such statements, Sahs also alleges that Loyola was negligent for suspending Sahs based on unfounded false reasons and pretenses; in its duties to properly supervise, train and/or instruct its private security employees; and in its mishandling of confidential or otherwise private information that was shared with its own media entity. (ROA.978.) Loyola fails to explain how these claims, which also make up Sahs's negligence claim, are 'regurgitations' of his defamation claims.

Sahs can satisfy all the elements of his negligence claim: duty, breach, cause-in-fact, legal causation, and damages. *Mathieu v. Imperial Toy Corp.,* 94-952, (La. 11/30/94), 646 So.2d 318, 322. It is undisputed that Loyola owed a duty to Sahs to exercise reasonable care including conforming to a certain standard of conduct. (ROA.466-467.) Sahs has also provided significant evidence to show that Loyola,

by and through its employees, did not conform with its duty of care owed to Sahs, including suspending Sahs without an opportunity to defend himself, failing to train, instruct, or supervise its private security employees, and providing otherwise confidential information to members of the media for publication. (ROA.438-440.) Finally, Sahs has demonstrated that the negligence of Loyola was the legal cause and cause-in-fact of his injuries in this matter. (ROA. 419, 469.)

    *ii.  Sahs Will Prevail on His Claim for Negligent Infliction of Emotional Distress*

Loyola states that Sahs's claim for negligent infliction of emotional distress ("NIED") must also fail because it is derivative of Sahs's defamation case. Contrary to Loyola's assertions, Louisiana law allows for independent claims of NIED. The Louisiana Supreme Court set forth in *Spencer v. Valero Ref. Meraux, LLC*, 356 So. 3d 936 (La. 2023), the standard for NIED, which includes proving the elements of negligence, and then a showing of "serious" mental disturbance or damage. *Id.* at 950.

Further, the Court in *Spencer* elaborated on what is *not* required to prove a claim for NIED, including the existence of a special, direct duty owed to Sahs or that Loyola's conduct was outrageous or that Sahs's emotional distress be reasonably foreseeable or severe and debilitating. "A claim for negligent infliction of emotional distress is a claim that, by definition, requires a plaintiff to provide negligence." *Id.* Sahs has satisfied his burden to prove his claim for NIED. As discussed above, Sahs

has proven his claim for negligence against Loyola. Further, Sahs has submitted his declaration, offering evidence that he has suffered severe and significant mental anguish caused by Loyola's conduct. (ROA.983-986.)

### iii. *Sahs Will Prevail on His Claim for Vicarious Liability*

Loyola states that Sahs's claim for vicarious liability must also fail because it is derivative of Sahs's defamation case. Contrary to Loyola's assertions, it is axiomatic that Loyola is vicariously liable, under the doctrine of *respondeat superior*, for the acts and omissions of its officers, administrators, employees, servants, agents, and/or those over whom it exercised control, supervision, and direction. (ROA.471.)  More specifically, Loyola is liable under the doctrine of *respondeat superior* for the acts and omissions of, at minimum, Loyola's private security employees, Ms. Morgan-Jones, Ms. Jones, and Ms. Witt, all over whom it exercised control, supervision, and direction. (ROA.471.)

## III.  Conclusion

For the foregoing reasons, Plaintiff-Appellee respectfully urges this Court to affirm the District Court's order denying Defendant-Appellant Loyola's Special Motion to Strike and return this case to the District Court so the parties can engage in discovery on the factual issues that Appellant is clearly so eager to address, but, which, are ultimately not at issue here.

Indeed, the only question that this Court should be answering is whether

Article 971 impermissibly conflicts with Rules 12 and 56, and, therefore, should not be applied. If the answer is yes, there is an impermissible conflict that should prevent its application. Even assuming, *arguendo,* that Article 971 is substantive and not procedural, there is no doubt that Article 971 must yield to the Federal Rules because Rules 12 and 56 answer the same question as Article 971 with regard to pre-trial dismissal mechanisms and Article 971 imposes additional hurdles not present in the Rules. By affirming the District Court's judgment, this Court will preserve the primacy and uniformity of the Federal Rules and ensure predictability for all litigants entering federal court. As aptly stated in the concurring opinion of Chief Judge Kozinski in *Makaeff v. Trump*: "Federal courts have no business applying exotic state procedural rules which, of necessity, disrupt the comprehensive scheme embodied in the Federal Rules, our jurisdictional statutes, and Supreme Court interpretations thereof." 715 F.3d 254, 275 (9th Cir. 2013).

Dated: July 30, 2025.

Respectfully submitted,

By: */s/ Andrew C. Stebbins*
Andrew C. Stebbins (pro hac vice)
(Ohio Bar No. 0086387)
Buckingham Doolittle & Burroughs LLC
1375 E. 9th Street, Suite 1700
Cleveland, OH 44114
Telephone Office: (216) 736-4233
Email: astebbins@bdblaw.com

John W. Carpenter (La. Bar No. 03940)
Law Offices of John W. Carpenter, LLC
201 St Charles Ave., Suite 2500
New Orleans, La. 70170
Telephone Office: (504) 599-5955
Telephone Cell: (415) 577-0698
Email: john@jwcarpenterlaw.com


*Attorneys for Plaintiff–Appellee*
*Luke G. Sahs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2025, the foregoing Brief of Plaintiff-Appellee

Luke G. Sahs has been electronically transmitted to the Clerk of this Court using the

CM/ECF System for filing and that service was accomplished through the Notice of

Electronic Filing on the following ECF users:

Charles D. Marshall, III (La. Bar No. 27564)
Julie D. Livaudais (La. Bar No. 01183)
Douglas L. Grundmeyer (La. Bar No. 06362)
Rosalie M. Haug (La. Bar No. 37720)
CHAFFE McCALL, L.L.P.
1100 Poydras Street, 2300 Energy Centre
New Orleans, LA 70163-2300
Telephone: (504) 585-7000
Facsimile: (504) 585-7075
Email: marshall@chaffe.com
Email: livaudais@chaffe.com
Email:grundmeyer@chaffe.com
Email: haug@chaffe.com

*Attorneys for Defendant-Appellant*
*Loyola University New Orleans*

By: */s/ Andrew C. Stebbins*
Andrew C. Stebbins
(Ohio Bar No. 0086387) (*pro hac vice*)
Buckingham Doolittle & Burroughs LLC
1375 E. 9th Street, Suite 1700
Cleveland, OH 44114
Telephone Office: (216) 736-4233
Email: astebbins@bdblaw.com

*Attorney for Plaintiff- Appellee*
*Luke G. Sahs*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This Brief of Appellee complies with the type-volume limitations of Fed. R. App. P. 27(d)(2) and 5th Cir. R. 32.2 because it contains 12,695 words, excluding the parts of the brief exempted by Fed. R. App. P. 27(a)(2)(B).

This brief complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 software in Times New Roman 14-point font, except for the footnotes, if any, which are in proportionally spaced type-face, including serifs, using Word in Times New Roman 12-point font.

Dated: July 30, 2025

By: */s/ Andrew C. Stebbins*
Andrew C. Stebbins

*Attorney for Plaintiff–Appellee*
*Luke G. Sahs*